Matthew J. Langley (SBN 342286)
matt@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 773-554-9354

Andrew R. Tate (*pro hac vice* forthcoming)
atate@peifferwolf.com
**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
(314) 669-3600

*Attorney for Plaintiffs & the Proposed Class*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| N.G., R.L., R.S., and I.P., *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>vs.<br><br>WALGREEN CO.,<br><br>Defendant. | Case No.:  3:26-cv-2994<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiffs N.G., R.L., R.S., and I.P. ("Plaintiffs"),[1] bring their class action lawsuit on behalf of themselves, and all others similarly situated (the "Class Members") against Defendant Walgreens Co. d/b/a Walgreens ("Walgreens" or "Defendant") in their individual capacity and on behalf of all others similarly situated and allege, upon personal knowledge as to their own actions and their counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.    This case concerns a practice that goes well beyond the typical website tracking allegations now common in federal courts. For years—and continuing to this day—Walgreens has secretly transmitted information revealing what vaccines millions of Americans scheduled on its website to third parties, including Adobe Inc. ("Adobe"), using sophisticated tracking technologies embedded in its digital platform. It did this without its patients' knowledge or consent.

2.    Each time a patient used Walgreens' vaccine scheduling tools on its website, www.walgreens.com (the "Website"), including the webpage https://www.walgreens.com/findcare/schedule-vaccine, Walgreens caused that patient's browser to send information—including webpages visited, vaccine selections, and persistent unique identifiers—to Adobe in real time. In doing so, Walgreens leveraged tools designed for advertising and highly sophisticated user profiling in the context of healthcare services, allowing information about *identifiable patients'* efforts to obtain vaccinations to be widely transmitted outside the provider-patient relationship.

3.    The implications of this practice are significant: if patients cannot trust that their interactions with a healthcare provider—particularly when seeking vaccinations or other medical care—will remain confidential, that trust, and the broader healthcare system that depends on it, is undermined.

4.    Walgreens accomplishes its secret disclosures by embedding tracking tools on its Website—including Adobe Analytics beacon requests (image/HTTP requests) together with

---

[1] Plaintiffs file their Complaint under pseudonyms to protect their health information under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") as well as California and Illinois law.

CLASS ACTION COMPLAINT

persistent identifiers such as the Adobe Experience Cloud Identifier ("ECID") and Adobe's "demdex" cookie (collectively, the "Tracking Technologies"). As implemented, these Tracking Technologies automatically transmit patients' interactions with Walgreens' Website to Adobe contemporaneously with those interactions, without any action by the patient.

5.    These transmissions reveal highly sensitive information concerning patients' healthcare activities, including their intent to obtain vaccinations and other medical services.

6.    Walgreens operates thousands of pharmacies nationwide and maintains a digital platform through which patients can access healthcare services, including scheduling vaccinations, booking medical tests, and managing prescriptions. Walgreens actively encourages patients to use its Website for these purposes.

7.    At the same time, Walgreens deploys the Tracking Technologies in a manner that causes patients' healthcare-related interactions to be transmitted to Adobe automatically and in real time. These transmissions include information reflecting the substance of patients' communications with Walgreens, including vaccine-related activity, together with persistent identifiers that enable Adobe to associate those communications with specific users.

8.    As implemented, the Tracking Technologies function as hidden surveillance tools, capturing and transmitting patients' interactions with vaccine scheduling pages at the moment those interactions occur. This allows Adobe to receive and process information reflecting patients' healthcare activities in real time.

9.    The information transmitted to Adobe is not anonymous. It is sent together with persistent identifiers, including ECIDs and other tracking data, enabling Adobe to associate patients' healthcare-related interactions with particular users and incorporate that information into user profiles used for analytics, marketing, and targeted advertising.

10.    Walgreens made the deliberate decision to deploy these Tracking Technologies despite knowing that patients would use its Website to communicate sensitive health-related information. Walgreens encourages patients to schedule vaccinations and access healthcare services online, while simultaneously enabling the transmission of those interactions to a third party for non-healthcare purposes.

CLASS ACTION COMPLAINT

11. Patients reasonably expect that their interactions with a healthcare provider—particularly when scheduling vaccinations or seeking medical services—will remain confidential. That expectation is reinforced by longstanding norms of medical confidentiality and by federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which strictly regulates the disclosure of individually identifiable health information by covered entities such as Walgreens.

12. Consistent with those expectations, neither Plaintiffs nor Class Members provided informed consent for Walgreens to transmit their healthcare-related interactions to Adobe. Walgreens did not obtain any written authorization permitting such disclosures.

13. By transmitting patients' healthcare-related communications to Adobe through the Tracking Technologies, Walgreens discloses and enables the interception of information protected by well-established privacy norms and legal safeguards, including those reflected in HIPAA. Such conduct is independently unlawful—even criminal—and supports application of the crime-tort exception to statutory defenses that might otherwise be asserted under the Federal Wiretap Act.

14. As a result of Walgreens' conduct, Plaintiffs and Class Members' Private Information is intercepted, disclosed, and incorporated into Adobe's data systems, where it is used to build profiles, analyze behavior, and support targeted advertising and other commercial uses.

15. Plaintiffs bring this action to enjoin Walgreens' unlawful practices, to obtain damages and other relief for the invasion of their privacy, and to require Walgreens to disclose the full scope of its data sharing practices and the identities of all recipients of patients' Private Information.

16. Plaintiffs seek to remedy these harms and brings causes of action for (i) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), et seq.; (ii) invasion of privacy – public disclosure of private facts under Illinois law; (iii) invasion of privacy – public disclosure of private facts under California law; (iv) invasion of privacy – intrusion upon seclusion under California law; (v) violation of California Constitution Article I, § 1; (vi) Negligence under Illinois law; (vii) Negligence under California law; (viii) violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631; (ix) violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 632; (x) violation of Cal. Penal Code §§ 638.50, 638.51; (xi)

3
CLASS ACTION COMPLAINT

violation of the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, et seq.; (xii) violation of the California Confidentiality of Medical Information Act, Cal. Civil Code §§ 56, et seq.; and (xiii) unjust enrichment.

**PARTIES**

17.    Plaintiff N.G. is, and at all relevant times was, an individual residing in Pleasant Hill, California in the county of Contra Costa. Plaintiff used Defendant's Website to schedule vaccinations for COVID-19. As a result, Plaintiff's Private Information was disclosed to Adobe without her knowledge, consent, or authorization.

18.    Plaintiff R.L. is, and at all relevant times was, an individual residing in San Francisco, California in the county of San Francisco. Plaintiff used Defendant's Website to schedule vaccinations for COVID-19. As a result, Plaintiff's Private Information was disclosed to Adobe without her knowledge, consent, or authorization.

19.    Plaintiff R.S. is, and at all relevant times was, an individual residing in San Francisco, California in the county of San Francisco. Plaintiff used Defendant's Website to schedule vaccinations for COVID-19. As a result, Plaintiff's Private Information was disclosed to Adobe without his knowledge, consent, or authorization.

20.    Plaintiff I.P. is, and at all relevant times was, an individual residing in Petaluma, California in the county of Sonoma. Plaintiff used Defendant's Website to schedule vaccinations for polio, hepatitis, typhoid, and yellow fever. As a result, Plaintiff's Private Information was disclosed to Adobe without her knowledge, consent, or authorization.

21.    Defendant Walgreen Co. is an Illinois Corporation, headquartered in Illinois at 108 Wilmot Road in Deerfield, Illinois 60015. Defendant Walgreen Co. does business as Walgreens throughout the United States, as well as through several global health and beauty product brands. According to the Illinois Secretary of State, Defendant's Registered Agent is Illinois Corporation Service Company, 801 Adlai Stevenson Drive, in Springfield, Illinois 62703.

22.    Defendant is a covered entity under HIPAA with respect to it providing vaccinations to its patients and managing appointments for the same.

4

CLASS ACTION COMPLAINT

**JURISDICTION & VENUE**

23.    Their Court has subject matter jurisdiction over their action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d) because their case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

24.    Their Court also has federal question jurisdiction under 28 U.S.C. § 1331 because their Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*).

25.    Additionally, their Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because the statutory and common-law claims alleged herein form part of the same case or controversy to the federal claims.

26.    Their Court has personal jurisdiction over Defendant because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in California, including Walgreens' interception and use of Plaintiffs' unique identifiers and other personal data.

27.    Venue is proper 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in their Class Action Complaint was carried out in their District.

**COMMON FACTUAL ALLEGATIONS**

  a.  **Background of User Tracking**

28.    Adobe's tracking technologies, including its Experience Cloud products, contain persistent identifiers that recognize users across interactions and over time enable tracking at the user or device level, rather than limited session-based tracking.

29.    These identifiers allow companies using Adobe's technologies to associate user activity with specific users, including across multiple sessions and interactions. The use of Adobe identifiers, particularly the Adobe Experience Cloud ID (the "ECID" or "MID") [2] and demdex

---

[2]    *Index of IDs in Audience Manager*, ADOBE (Sept. 28, 2021), https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/ids-in-aam (last visited Dec. 14, 2025)

cookie, have allowed companies to circumvent existing privacy protections through the use of these identifiers as an alternative to privacy-preserving mechanisms.

### b. Adobe's Tracking Technologies

#### i. Adobe's Unique Identifiers

30. Adobe's ECID is a first-party cookie that assigns a persistent, unique identifier to each user and enables tracking across Adobe Experience Cloud products, including Analytics, Target, and Audience Manager, as well as broader identity syncing with other advertising partners.[3] Through ECID, Adobe facilitates unified data collection and personalization consistently across mobile applications and websites.

31. Adobe uses the ECID framework to track unique users across websites and online services owned by the same companies and also *different* companies. When a company initially sets the ECID, they call Adobe's "Data Collection Server" at the URL "dpm.demdex.net"[4] and transmit their "organization ID" to that server. Adobe's Data Collection Server processes their information and transmits back the user's ECID (identified in the Figure below as "MID") as well as a **demdex.net cookie** associated with that specific individual.[5] **Figures A, B and C** below reflect Adobe's own documentation on this process:

---

[3] *Experience Cloud Identity Service Overview*, ADOBE, https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview (last visited Dec. 14, 2025).

[4] *Third-Party Cookies: Why CNAME in Adobe Analytics,* NEXTROW (Oct. 4, 2023), https://www.nextrow.com/blog/adobe-analytics/third-party-cookies-why-cname-in-adobe-analytics (last visited Dec. 14, 2025). "DPM" itself stands for "Data Provider Match" and refers to Adobe's ID syncing process. *See Glossary*, ADOBE (Aug. 18, 2021), https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/aam-glossary (last visited Dec. 14, 2025)

[5] *How the Experience Cloud Identity Service Requests and Sets IDs*, ADOBE, https://experienceleague.adobe.com/en/docs/id-service/using/intro/id-request (last visited Dec. 15, 2025).

CLASS ACTION COMPLAINT

**FIGURE A**[6]



**FIGURE B**



**FIGURE C**



[6] *Id.*

32. In the above example, the demdex.net cookie set for the unique visitor who stopped at "Food Company" is 5678. Because the demdex.net cookie is persistent across websites—even those owned and operated by different website providers—when the "Food Company" user visits a new website, the demdex.net cookie continues to track them.

33. Their use of persistent identifiers is further described in **Figure C**, which continues the same example by showing that when the previous "Food Company" customer visits "Sports Company" Adobe's Data Collection Server assigns the same demdex.net cookie—5678. Thus, Adobe knows the same unique individual who visited "Food Company" is the same unique individual who visited "Sports Company." Their process allows Adobe to track individuals' movements across the internet, including their interactions with different websites that may use some of its technologies.

34. More problematic, Adobe syncs demdex, ECID, cookies and other ids with third-party data brokers and advertising and technology entities, a practice known as **ID Bridging** or **Cookie Syncing**. In this process, advertising companies and/or data brokers, like Adobe, share identifiers and cookies with one another permitting even more robust identification and tracking. Therefore, when a company, such as Walgreens, shares Private Information with Adobe through Adobe's Tracking Technologies, it is not only shared with Adobe, *but also other entities that Adobe performs these advertising and technology practices with*.

35. Syncing identifiers with these entities greatly enhances Adobe's ability to profile individuals by allowing it to identify and link users' activity across websites and mobile apps that *do not use* Adobe's products or services to its own identity profile. When a user visits a website, each third party—which may include DSPs, ad exchanges, analytics providers, or other participants in the digital advertising ecosystem—will set their own tracking cookies and assign the individual visitor a unique ID. For example, The Trade Desk, which operates one of the largest identity profiling and tracking services for digital ads, maintains its own proprietary identifier similar to

CLASS ACTION COMPLAINT

Adobe's ECID called "TDID" (which is short for "Trade Desk ID").[7] The Trade Desk and Adobe sync their first-party identifiers or cookies,[8] allowing them to bridge these two IDs such that an individual is identifiable though either identifier directly *or* any other piece of information—such as their email address, mobile phone number, mobile advertising identifier, ("MAID"), etc.— associated with either company's identity profile. Their identifiers allow Adobe and partners to recognize, bid on and target the user in real-time bidding auctions.

36.    Adobe's identifiers not only allow Adobe to identify the specific individuals associated with them when they appear—whether from cookie sync or ad request—but also have the added benefit of defeating privacy promoting features of modern browsers and apps. For example, Adobe uses **CNAME Cloaking** (or masking) to ensure it obtains these identifiers (alongside other data) regardless of whether the individual is using a cookie blocker or a privacy-preserving browser. These tools are intended to allow consumers to ensure that they are protected from undesired data collection by third-party advertising and tracking services, like Adobe, often blocking communications to third-party domains. Adobe's "CNAME implementations" is built to get around that, allowing Adobe to place cookies as though they originate from its customers' "first-party collection domain,"[9] circumventing cookie blockers designed to stop third-party cookies trackers.

37.    Adobe offers its CNAME implementation to *all* its clients, including those that obviously process sensitive information, such as health data. Using their implementation, the endpoint for data transmissions is registered by certain cookie blockers as a first-party domain. Accordingly, these cookie blockers would *not* block transmissions to their domain even though, in reality, it is not truly a first-party domain but a transmission to third party Adobe. Their persistent

---

[7] *Unified ID Adoption Guidelines for SSPs*, THE TRADE DESK (Oct. 2019), https://www.thetradedesk.com/assets/global/Unified-ID-Adoption-Guidelines-for-SSPs-v1.8.pdf (last visited Dec. 14, 2025).

[8] *Cookie Mapping*, THE TRADE DESK, https://partner.thetradedesk.com/v3/portal/ssp/doc/CookieMapping (last visited Dec. 14, 2025).

[9] *Adobe-Managed Certificate Program*, ADOBE, https://experienceleague.adobe.com/en/docs/id-service/using/reference/analytics-reference/cname (last accessed Dec. 14, 2025).

9

CLASS ACTION COMPLAINT

identifiers allow Adobe to avoid cookie blockers. Even the most savvy consumers are also unlikely to know that a cookie listed as a *first-party* cookie on a non-Adobe website belongs to Adobe, because it would be illogical for a "first-party" cookie to belong to a third-party.

38.     Additionally, Adobe utilizes its **demdex cookie**, which also assists in limiting detection of Adobe collecting a user's information when they visit websites featuring Adobe's cookies and that it subsequently follows them across the internet. Even if the consumer monitors their web browser to evaluate which cookies are tracking them, the demdex cookie will reflect that it originates from the demdex.net domain, with no indication that the cookie in fact belongs to Adobe.

39.     The demdex cookie is also particularly nefarious because it circumvents many of the anti-cookie protections that have been put in place for the benefit of consumers who do not want to be followed across the internet. For instance, individuals are increasingly met with cookie consent popups that ask whether they consent to the placement of non-essential cookies (including third-party cookies) as they navigate the internet. Even if the user indicates that they do not consent to the placement of non-essential cookies, their decision has *no effect whatsoever* on the demdex cookie. The demdex cookie is placed on the user's device near-instantaneously—within milliseconds—when they navigate to a website, ***before*** any consent is solicited by the website itself. Consequently, the cookies are already placed by the time the popup appears, and indicating that the user does not consent to the placement of non-essential cookies will not affirmatively remove cookies that have *already been placed* like the demdex cookie. Thus, not only is the name of the demdex cookie intended to conceal its identity, it is placed in a way that circumvents opt out controls to track users even when they think are not being followed.

40.     Adobe also uses additional tracking cookies and unique identifiers.

//

//

CLASS ACTION COMPLAINT

### ii.  Adobe's Comprehensive Identity Solution

41.    Adobe does not just provide identity solutions; it also launched the **Adobe Experience Platform Identity Service** to use these identifiers (and others) to profile users.[10]

42.    The Experience Platform Identity Service is designed to keep identity tracking consistent when the same user logs in or interacts with a website from multiple devices, such as from their phone and then their laptop, which would otherwise create multiple, disparate identifiers. Through their service, Adobe collects all the identifiers across devices and websites and links that to an "identity graph" through what it calls its "**Identity Graph Generator**." This identity profile associates all the known identifiers with the same individual, even though they would previously appear as multiple unique users.

**FIGURE D[11]**



---

[10]  *Monitor Dataflows For Identities In The UI*, ADOBE (April 1, 2025), https://experienceleague.adobe.com/en/docs/experience-platform/dataflows/ui/monitor-identities (last visited Dec. 14, 2025).

[11]  *Adobe Experience Platform Identity Service*, ADOBE (Nov. 24, 2025), https://experienceleague.adobe.com/en/docs/experience-platform/identity/home.

CLASS ACTION COMPLAINT

43.   As shown in shown in **Figure D**, through the Adobe Experience Platform Identity Service, Adobe receives identifiers, such as ECIDs, IP addresses, Login IDs, and email addresses, which it can then reconcile as the same user through its Identity Graph Generator.[12]

44.   As shown in **Figure E**, Adobe itself does not see its identity solutions as either a "session" or "device" level identifier, but a way to identify actual people, akin to a social media profile. **Figure E** depicts what their profile looks like in the Adobe dashboard.

**FIGURE E**



45.   In fact, Adobe's identity solutions are ***stronger*** identifiers than those that previously existed, as Adobe itself acknowledges. For instance, most first-party cookies are limited in that they only track a user on one specific website.[13] Adobe's Experience Platform Identity Service goes much further, by tracking users across permanent identifiers, such as email address, and first-party cookies like ECID.[14] Their makes it possible to create an identity profile that serves advertisers'

---

[12]   *Adobe Experience Platform Identity Service*, ADOBE (Aug. 18, 2024), https://experienceleague.adobe.com/en/docs/experience-platform/identity/home (last visited Dec. 14, 2025).

[13] Hannah Barnstore, *What is a First-Party Cookie?*, KETCH BLOG (Feb. 12, 2025), https://www.ketch.com/blog/posts/what-is-a-first-party-cookie (last visited Dec. 14, 2025).

[14]   *Identity Data for Privacy Requests*, ADOBE (Jan. 21, 2024), https://experienceleague.adobe.com/en/docs/experience-platform/privacy/identity-data (last visited Dec. 29, 2025).

CLASS ACTION COMPLAINT

needs, by aggregating data across all apps and websites a person uses that incorporates Adobe's technology, at the expense of individual's right to privacy.

46.    Adobe's status as an identity broker allows it to track users across the internet and develop unique profiles, which Adobe then offers to its customers to use with Adobe's other marketing and analytics products.[15]

### iii. Adobe's Data Collection Methods

47.    Adobe created the Experience Platform Identity Service precisely because of its synergy with its existing analytics, advertising, and AI products. Collectively, all of these services are referred to as the **Adobe Experience Cloud Platform**. A subset of the services included in the Adobe Experience Cloud Platform are described below.

48.    One of the products Adobe offers is **Adobe Analytics,** which includes its **Data Collection Tag** (dtm.adobedtm.com, assets.adobetm.com). Their Adobe Data Collection Tag is deployed directly on web pages and mobile applications.[16] When used, the Data Collection Tag automatically captures the ECID, along with other data and identifiers, including browser type, device characteristics, and IP address.[17] It also collects more sensitive data revealing the user's communications with the website provider, including pages they visited, searches they conducted,

---

[15]    *Real-Time Customer Profile Overview*, ADOBE (April 1, 2025), https://experienceleague.adobe.com/en/docs/experience-platform/profile/home (last visited Dec. 14, 2025).

[16]    *Data Collection Overview*, ADOBE (May 14, 2025), https://experienceleague.adobe.com/en/docs/experience-platform/collection/home#:~:text=Adobe%20Experience%20Platform%20provides%20a,the%2Dtop%20(OTT)%20applications (last visited Dec. 14, 2025).

[17]    *Ingest Data via the Web SDK*, ADOBE (Apr. 16, 2025), https://experienceleague.adobe.com/en/docs/analytics-platform/using/cja-data-ingestion/ingest-use-guides/edge-network/aepwebsdk (last visited Dec. 15, 2025).

CLASS ACTION COMPLAINT

and more.[18] Their information is transmitted directly to Adobe's own servers, as indicated by Adobe owned domains like demdex.net and adobedc.net.[19]

49.    The Adobe Data Collection Tag intercepts the Adobe Experience Cloud ID (ECID) and online users' private communications directly from webpages and redirects it to its own servers, aggregating that information with a user's profile, so it can be used for advertisements, including the creation of custom audiences, lookalike audiences, and campaign optimization.[20]

50.    In addition to the Adobe Data Collection Tag, Adobe uses the following additional technologies to extract and combine the data listed above from thousands of websites and applications, as well as other private data, such as users' queries, searches, and browsing habits and other activity, including web beacons, Adobe Software Development Kits (SDKs), Plug-ins (such as getGeoCoordinates, which provides location information), and server-side tracking.

51.    Taken as a whole, its suite of surveillance tools, and the data gathered by those tools and tracking methods, are used to offer and enhance its marketing services, including identity resolution programs, analytics services, and more.

#### iv.  Adobe's Monetization and Use of Users' Data

52.    The data collected through the Adobe Data Collection Tag is used for developing complex analytics, which reveal more information about the user than the data itself. Adobe does not merely collect data—it aggregates and analyzes user interactions to build comprehensive user profiles. Through its Experience Platform and related services, Adobe combines identifiers such as

---

[18]    *Behavior Reports*, ADOBE (Apr. 9, 2023), https://experienceleague.adobe.com/en/docs/analytics/technotes/ga-to-aa/reports/behavior-reports (last visited Dec. 14, 2025).

[19]    *Identity Data in Web SDK*, ADOBE (Dec. 8, 2025), https://experienceleague.adobe.com/en/docs/experience-platform/collection/use-cases/identity/id-overview (last visited Dec. 14, 2025).

[20]    *Look-alike audiences guide*, ADOBE (Nov. 5, 2025), https://experienceleague.adobe.com/en/docs/experience-platform/segmentation/types/lookalike-audiences (last visited Dec. 14, 2024).

ECIDs with data collected from websites and other sources to create a unified profile associated with an individual user.

53. These profiles incorporate a user's interactions, behaviors, and inferred characteristics, allowing Adobe to identify and track users across different websites, devices, and contexts.

54. Adobe uses their data to provide analytics, predictive modeling, and targeted advertising services. For example, Adobe enables its customers to create audience segments, identify users likely to take certain actions, and deliver targeted content or advertisements based on those profiles.

55. Importantly, the data transmitted to Adobe is not confined to a single website or interaction. Instead, it is incorporated into Adobe's broader data ecosystem, where it can be used to enhance user profiles and support advertising and marketing activities across multiple platforms and clients.

56. As a result, when Defendant transmitted Plaintiffs' vaccine-related interactions to Adobe, that information was not merely collected—it was linked to a persistent identifier and incorporated into a broader profile used for tracking, analysis, and targeted advertising.

**c. Walgreens Disclosed Plaintiffs' Private Information to Adobe and Assisted Adobe in Intercepting Their Communications with its Website.**

57. Defendant's Website is accessible on mobile devices and desktop computers and allows patients to communicate with Defendant regarding their vaccine appointment scheduling.

58. Defendant encouraged patients to use its Website to communicate their Private Information, schedule appointments, communicate information about their medical treatments, and more.

59. Despite this, Defendant purposely installed Tracking Technologies on its Website and programmed specific webpage(s) to surreptitiously share its patients' private and protected communications, including Plaintiffs' and Class Members' PHI and/or PII, which was sent to Adobe and other third parties.

60. The Tracking Technologies recorded and disseminated patients' information as they

CLASS ACTION COMPLAINT

navigated and communicated with Defendant via the Website, simultaneously transmitting the substance of those communications to unintended and undisclosed third parties.

61.    The information disseminated by the Tracking Technologies to third parties constitutes Private Information including medical information patients communicated, requested or viewed, the title of any buttons clicked (such as on the "**Schedule Vaccination Appointment**(s)" page and subsequent pages, which ultimately communicate the vaccine selection by a patient), and other sensitive and confidential information, the divulgence of which is and was highly offensive to Plaintiffs, including webpages that have access to "information that relates to any individual's past, present, or future health, health care, or payment for health care."

62.    The information collected and disclosed by Defendant's Tracking Technologies is not anonymous and is viewed and categorized by the intercepting party on receipt.

63.    The information Adobe received via the Tracking Technologies was linked and connected to patients' persistent unique identifiers such as the ECID and other identifiers, which capture patients' PII.

64.    Simply put, the health information that was disclosed via the Tracking Technologies is personally identifiable and was sent alongside other persistent unique identifiers such as the patients' ECID and device identifiers.[21]

**d.    Walgreens' Tracking Technologies, Source Code, and Interception of HTTP Requests and Transmission of HTTP Requests.**

65.    Web browsers are software applications that allow consumers to navigate the internet and exchange electronic communications, and every "client device" (computer, tablet or smart phone) has a web browser (e.g., Microsoft Edge, Google Chrome, Mozilla's Firefox, etc.).

66.    Every website is hosted by a computer "server" which allows the website's owner

---

[21] *See Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1056 (N.D. Cal. 2021) (discussing how Google collects personal information and IP addresses); *see also Adobe Experience Cloud – Privacy Information* (June 3, 2025) https://www.adobe.com/privacy/experience-cloud.html ("Adobe's business customers use Adobe Experience Cloud solutions to support their marketing and advertising efforts. These solutions enable our business customers to build, personalize, and improve the performance of their websites and apps by collecting and analyzing information, such as clicks made by visitors on their websites, apps, and social media pages.").

CLASS ACTION COMPLAINT

(Defendant) to display the Website and exchange communications with the website's visitors (Plaintiffs and Class Members) via the visitors' web browser.

67.    When patients used Defendant's Website, they engaged in an ongoing back-and-forth exchange of electronic communications with Defendant wherein their web browser communicated with Defendant's computer server—like how two telephones communicate.

68.    These communications are invisible to ordinary consumers, but one browsing session may consist of thousands of individual HTTP Requests and HTTP Responses.

69.    A patient's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as a "**Schedule Vaccination Appointment**(s)" page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons and other features that appear on the patient's screen as they navigate Defendant's Website).

70.    Every webpage is comprised of both Markup and "source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

71.    Defendant's Tracking Technologies were embedded in its Website' source code, which is contained in its HTTP Response. The Tracking Technologies, which Walgreens directed to be programmed to automatically track patients' communications and transmit them to third parties, executed instructions that effectively opened a hidden spying window into each patients' web browser, through which third parties, including Adobe, intercepted patients' communications and activity.

72.    For example, when a patient visits  www.walgreens.com and selects the link to the "Schedule Vaccinations" webpage, the patient's browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage. As depicted below, the user only sees the Markup, not Defendant's source code or underlying HTTP Requests and Responses.

CLASS ACTION COMPLAINT



*Figure F: The image is a screenshot taken from the user's web browser upon visiting*

**https://www.walgreens.com/findcare/schedule-**

**vaccine?ban=HP_HealthPills_5252025_Vaccines/.**

18

CLASS ACTION COMPLAINT

73.    The image above displays the Markup of Defendant's webpage. Behind the scenes, however, the Adobe Tracking Technologies are embedded in the source code, automatically transmitting everything the patient does on the webpage and effectively opening a hidden spy window into the patients' browser.

e.    **Defendant Disclosed Plaintiffs' and Class Members' Private Information to Adobe and other Third Parties Using Tracking Technologies.**

74.    Defendant employed Tracking Technologies to intercept, duplicate and re-direct Plaintiffs' and Class Members' Private Information to Adobe and other third parties.

75.    Defendant's source code manipulates the patient's browser by secretly instructing it to disclose the patient's communications (HTTP Requests) with Defendant and to send those communications to Adobe. These transmissions occur contemporaneously, invisibly and without the patient's knowledge.

76.    Thus, without its patients' consent, Defendant used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Adobe to listen in on all of their communications with Defendant and thereby intercept those communications, including their Private Information, and specifically including their request to schedule particular vaccinations.

77.    The Tracking Technologies allow Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences and decrease advertising and marketing costs. However, Defendant's Website does *not* rely on the Tracking Technologies to function.

78.    While seeking and using Defendant's services as a medical provider, Plaintiffs and Class Members communicated their Private Information to Defendant via its Website.

79.    Plaintiffs and Class Members were not aware that their Private Information would be shared with third parties as it was communicated to Defendant because, amongst other reasons, Defendant did not disclose their fact.

80.    Plaintiffs and Class Members never consented, agreed, authorized or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant—particularly concerning their private requests for vaccinations

19

CLASS ACTION COMPLAINT

from a medical provider.

81. Defendant's use of Tracking Technologies sent non-public Private Information to third parties like Adobe, including but not limited to Plaintiffs' and Class Members', including their status as medical patients and medical treatments (e.g., vaccines).

82. Importantly, the Private Information Defendant's Tracking Technologies sent to third parties included PII that allowed those third parties to connect the Private Information to a specific patient. Information sent to Walgreens was sent alongside the Plaintiffs' and Class Members' ECID, thereby allowing individual patients' communications with Defendant and the Private Information contained in those communications to be linked to their unique Adobe unique identifiers.

83. As described above, a user's ECID is linked to Adobe's identity profile for the particular user, which contains a wide range of demographics and other information about the user. By installing and configuring Adobe's Tracking Technologies to capture Plaintiffs' and Class Members' requests to schedule vaccine appointments for particular vaccines, Walgreens disclosed their highly sensitive information to Adobe, where it now lives as part of Plaintiffs' and Class Members' unique identity profiles.

84. Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (i) implemented Tracking Technologies that surreptitiously tracked, recorded and disclosed Plaintiffs' and other patients' confidential communications and Private Information; (ii) disclosed patients' protected information to unauthorized third parties and (iii) undertook their pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

85. By installing and implementing the Adobe Tracking Technologies, Defendant caused Plaintiffs' and Class Member's communications to be intercepted by and/or disclosed to third parties, and for those communications to be personally identifiable.

86. As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via the Website.

**f. Defendant's Tracking Technologies Disseminate Patient Information Via Its Website.**

87. If a patient uses Defendant's Website to find care, its Website directs them to

CLASS ACTION COMPLAINT

communicate Private Information, including the appointment zip code, city or state, date of birth, email address, and phone number.



*Figure G: Screenshot taken where the patient enters the initial vaccine appointment information, including the appointment zip code, city or state, date of birth, email address, and phone number upon visiting https://www.walgreens.com/findcare/schedule-vaccine?ban=HP_HealthPills_5252025_Vaccines/.*

CLASS ACTION COMPLAINT

88.    Unbeknownst to the patient, even on their landing page, the fact that the patient is seeking to get a vaccine is sent to Adobe and via Defendant's usage of Adobe's Tracking Technologies.

89.    Upon patient entering the requested Private Information and clicking "Next," Patient is taken to another page for vaccine selection.



*Figure H. Screenshot from Defendant's Website depicting markup page for vaccine selection.*

90.    Without the ordinary patient's knowledge, the webpage in **figure H** (above)—which

22

CLASS ACTION COMPLAINT

is undoubtedly used to communicate Private Information for the purpose of seeking medical treatment—contains the Tracking Technologies. The image below shows the "behind the scenes" portion of the Website that is invisible to ordinary users:



*Figure I: Screenshot from Defendant's Website depicting back-end network traffic after the patient selects vaccine type*

91.     Thus, without alerting the user, Defendant's use of Tracking Technologies sends the communications the user made via the webpage to Adobe, and the images below confirm that the communications Defendant sends to Adobe contain the user's Private Information.

*[Remainder of page intentionally left blank]*

23

CLASS ACTION COMPLAINT



***Figure J: Screenshot from the Network traffic report depicting the presence of Adobe Tracking Technologies, along with the information sent to Adobe***

92.    As shown in **figure J**, the "authority" entry shows the presence of Adobe Tracking Technologies through "smetrics.walgreens.com," which reflects transmission to Adobe through that URL. However, from the ordinary person's perspective, it is not apparent that the information is being sent to Adobe, but rather simply remaining with Walgreens.

93.    **Figure J** also shows the usage of Adobe's AMCV cookie, which stores the persistent, unique identifier—known as the ECID or MID—that Adobe assigns each user that enables tracking across Experience Cloud products. In their figure, it displays their identifier is in multiple sections and begins with "800997."

94.    Together with the identifying information, **Figure J** also shows Defendant disclosing to Adobe the exact vaccine that the patient is seeking to schedule, which is the COVID-19 vaccine as shown in the highlighted portion starting with "vaccinations."

CLASS ACTION COMPLAINT



***Figure K: Screenshot of the payload that Adobe is sent regarding patient's***

***vaccination selection, along with the patient's MID.***

95.    The screenshot above displays the patient's MID, vaccination selection for COVID-19, and the Adobe Marketing Cloud Organization ID, which appears as the "mcorgid" and assigned

25

CLASS ACTION COMPLAINT

to the customer organization that is using Adobe's Tracking Technologies, which is Walgreens in their case.

96. Their transmission above, as well as all similar transmissions of Plaintiffs' and Class Members' vaccine scheduling requests along with their unique identifiers, constituted IIHI and PHI that Walgreens intentionally shared with Adobe.

97. Walgreens also discloses the path that the patient navigated through the Website by going through the "Find Care" page, then "Vaccinations" page, and then selecting "COVID-19."

98. At present, the full breadth of Defendant's tracking and data sharing practices is unclear, but evidence suggests Defendant is using additional Tracking Technologies to transmit its patients' Private Information to potentially additional third parties or providing other advertising companies' unique identifiers for individual patients to Adobe or other third parties for identity resolution.

99. Defendant does not disclose that the use of Adobe's Tracking Technologies or any other Tracking Technologies embedded in the Website's source code track, record, and transmit Plaintiffs' and Class Members' Private Information to Adobe and other third parties. Moreover, Defendant never received consent or written authorization to disclose Plaintiffs' and Class Members' private communications to Adobe.

## G. Defendant's Conduct Is Unlawful and Violated Industry Norms.

### i. Defendant Violated its own Notice of Privacy Practices.

100. Walgreens' Notice of Privacy Practices,[22] including its current policies and historical policies during the Class Period, represent to Plaintiffs and Class Members that it will keep Private Information private and secure and that it will only disclose Private Information under certain circumstances, ***none of which is true***.

101. Their Notice of Privacy Practices states that it applies to "health care products and services."[23] Vaccines are undisputedly health care services.

102. The Notice of Privacy Practices states that Plaintiffs' and Class Members' PHI will

---

[22] *Notice of Privacy Practices,* WALGREENS (Jan. 29, 2024), https://www.walgreens.com/topic/help/general/noticeprivacypractices.jsp.
[23] *Id.*

CLASS ACTION COMPLAINT

not be shared for marketing purposes without prior, written permission. Specially, it states, "We will obtain your written authorization for the . . . use or disclosure of PHI for marketing, and for the sale of PHI, except in limited circumstances where applicable law allows such uses or disclosure without your authorization."[24]

103.    Plaintiffs and Class Members have not provided Walgreens with written permission to share their PHI for marketing purposes.

104.    Furthermore, at all times relevant to their Complaint, no applicable law allowed or allows Walgreens to use, disclose, or sell Plaintiffs' PHI for marketing purposes without their authorization.

105.    Moreover, none of Defendant's other privacy policies (browsewrap), despite their increasing breadth over the years with respect to sharing customers' data, have ever specifically disclosed to Plaintiffs or Class Members that their vaccination selection and scheduling would be sent to third parties for any purposes, nor has Defendant every obtained informed consent from Plaintiffs or Class Members to do so.

106.    Furthermore, Walgreens' current, non-HIPAA Privacy Policy expressly states—in the second paragraph of their very lengthy policy—that personally identifiable information submitted to the pharmacy is subject to the requirements of HIPAA. The policy then states that "[i]n those circumstances, the Walgreens Notice of Privacy Practices and not their Privacy Policy will apply."[25]

107.    Defendant also falsely represents it would notify affected victims should a breach of unsecured PHI take place.

108.    In addition, Walgreens clearly knows what is required before sharing individuals' vaccination records, such as for COVID-19, with third parties as it provides a HIPAA authorization form to patients expressly for their purpose:

---

[24] *Id.*
[25] https://www.walgreens.com/topic/help/generalhelp/privacyandsecurity.jsp

27

CLASS ACTION COMPLAINT

# Walgreens

**AUTHORIZATION – FOR RELEASE OF HEALTH INFORMATION TO THIRD PARTY COVID-19 VACCINATION FORM**

This Authorization is for use, pursuant to the HIPAA privacy rules, if you are authorizing the release of medical/health information to a third party, such as your employer or university. You understand these records may contain information created by other persons or entities, including physicians and other health care providers as well as information regarding the use of drug and alcohol treatment services, HIV/AIDS treatment, mental health services (excluding psychotherapy notes), reproductive health services, and treatment for sexually transmitted diseases.

**Section 1:  Patient information**

Patient Name: _____
Date of Birth: _____
Street Address: _____
City, State, Zip: _____
Telephone Number:  ( ____ ) _____   E-mail Address: _____

**Section 2:  Person/entity authorized to receive information from Walgreens ("Designated Entity")**

McLaren

**Section 3:  Describe or list the information that you are asking us to release**

Information related to my COVID-19 vaccination.

**Section 4:  List the specific purpose for requesting this information**

I am currently associated with the Designated Entity and request that the Designated Entity receive information related to my COVID-19 vaccination.

**Section 5:  Expiration Date**

This authorization expires one year from the date of my signature.

*Figure L: HIPAA Authorization Form that Walgreens provides to patients before sharing COVID-19 vaccine information with employers or other third parties.*

CLASS ACTION COMPLAINT

**Walgreens**

Section 6:  Information regarding this Authorization

- You have the right to revoke this Authorization, in writing to Walgreens Privacy Office, at any time.  The revocation is only effective after it is received and logged by Walgreens.  Any use or disclosure made prior to a revocation is not included as part of the revocation.
- Refer to our Notice of Privacy Practices for permitted uses and disclosures of protected health information ("PHI").  You may obtain a copy of this Notice from the Privacy Office or on www.walgreens.com.  Please keep a copy of this authorization for your records.
- **Once PHI is disclosed to others, it may be redisclosed by them to persons or entities that are not subject to the privacy regulations, which means that the PHI may no longer be protected by regulations.**
- Privacy regulations prohibit the conditioning of treatment, payment, enrollment, or eligibility for benefits on signing this Authorization.
- This Authorization must be signed and dated by the patient or signed and dated by the patient's personal representative to include a description of that person's ability to act on behalf of the patient.

Section 7:  Signature

I, _____, by signing below, authorize Walgreens to use or disclose of my protected health information as described above.

_____
Signature                                                                              Date

Section 8:  If this Authorization is signed by the patient's personal representative, please explain your authority to act

109.   Despite providing patients with HIPAA authorization forms when the patients *knew* Walgreens would be sharing their vaccination information with third parties, Walgreens provided no such form to Plaintiffs and Class Members before secretly sharing their vaccination information with advertising companies *without their knowledge*.

110.   Upon information and belief, Walgreens intentionally did not provide a HIPAA authorization form to its patients before disclosing their vaccination appointment requests with third parties like Adobe through Tracking Technologies (so that Adobe could add that information to Adobe's identity profile of those individuals) because Walgreens knew patients may decline to share their vaccination information with Adobe, and Adobe's targeted advertising capabilities were more

29

CLASS ACTION COMPLAINT

valuable to Walgreens than its patients' medical privacy or complying with federal law.

111.   Despite a lack of disclosure to Plaintiffs and Class Members, Walgreens allowed third parties such as Adobe to "listen in" on patients' confidential communications with Walgreens and to intercept and use for advertising purposes the very information it promised to keep private, in order to bolster its profits.

112.   As alleged herein, after Adobe viewed and analyzed Plaintiffs' private communications with Walgreens, Plaintiffs began receiving targeted ads on related to their vaccination appointments.

### ii. Defendant Violated HIPAA.

113.   Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient or household member of a patient for marketing purposes without the patients' express written authorization.[26]

114.   The HIPAA Privacy Rule "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[27] The entities to whom the Privacy Rule applies are referred to as "covered entities" under HIPAA.

115.   Walgreens is a covered entity in its capacity as a pharmacy, as it admits in its Privacy Policy, Notice of Privacy Practices, and HIPAA Authorization forms for the release of patients' COVID-19 vaccination information, as described above. Indeed, in its Notice of Privacy Practices, Walgreens describes itself as an "affiliated covered entity" under HIPAA.

116.   The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

---

[26] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[27] HHS.gov, HIPAA For Professionals (last visited May 23, 2024), https://www.hhs.gov/hipaa/for-professionals/index.html

CLASS ACTION COMPLAINT

117. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

118. Under the HIPPA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

    A. Names;
      ***
    M. Device identifiers and serial numbers;
    N. Web Universal Resource Locators (URLs);
    O. Internet Protocol (IP) address numbers; … and
    R. Any other unique identifying number, characteristic, or code…; and
      The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

119. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

120. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered

31

CLASS ACTION COMPLAINT

entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

121. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

122. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

123. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then their information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then their information would be PHI.[28]

124. In its guidance for marketing, HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of their or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of*

[28] U.S. DEP'T OF HEALTH & HUMAN SERVS., OFFICE FOR CIVIL RIGHTS, *Guidance on De-identification of Protected Health Information* (2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Dec. 29, 2025).

CLASS ACTION COMPLAINT

*patients to third parties without obtaining authorization from each person on the list.* (emphasis added).[29]

125.   As alleged above, the OCR addresses the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.

126.   The Bulletin expressly provides that **"[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**." (emphasis in original).

127.   As such, Defendant's actions violated HIPAA.

### iii. Defendant Violated Industry Standards.

128.   A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

129.   The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

130.   AMA Code of Ethics Opinion 3.1.1 provides:
Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy).

131.   AMA Code of Medical Ethics Opinion 3.2.4 provides:
Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

132.   AMA Code of Medical Ethics Opinion 3.3.2 provides:

[29] U.S. DEP'T OF HEALTH & HUMAN SERVS., OFFICE FOR CIVIL RIGHTS, *Marketing* (Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing .pdf (last visited Dec. 29, 2025).

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

**H.      Plaintiffs' and Class Members' Reasonable Expectation of Privacy.**

133.    Plaintiffs and Class Members were aware of, and relied upon, Defendant's duty of confidentiality when they sought medical and pharmacy services from Defendant, including vaccination services.

134.    At all relevant times, Plaintiffs and Class Members had a reasonable expectation that the Private Information they provided in connection with those healthcare services— including information concerning vaccinations, vaccine-related inquiries, and appointment activity—would remain confidential and would not be disclosed to third parties for commercial or marketing purposes unrelated to patient care.

135.    These expectations reflect well-established societal norms. Studies and surveys consistently show that an overwhelming majority of Americans consider it a fundamental privacy right that companies obtain affirmative consent before collecting, sharing, or monetizing personal data.

136.    For example, a Consumer Reports study found that 92% of Americans believe companies should be required to obtain consent before sharing consumer data and should provide transparency regarding what data is collected.[30]

137.    These expectations are heightened in the healthcare context, where individuals reasonably expect that information relating to their medical care will remain strictly confidential. That expectation is at its apex where the information concerns specific treatment decisions or healthcare choices that may reveal deeply personal facts about an individual.

138.    In recent years, vaccination-related information has become particularly sensitive. Information reflecting whether, when, and how an individual seeks or obtains a vaccine—and even

---

[30] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-lessconfident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited Dec. 29, 2025).

CLASS ACTION COMPLAINT

inquiries or research related to vaccination—can reveal or be used to infer an individual's medical conditions, risk factors, personal beliefs, and private decision-making processes.

139. Unauthorized disclosure of such information creates a substantial risk of stigma, judgment, or unwanted profiling. Third parties can use their information to categorize individuals, draw inferences about their health status or beliefs, and target them with tailored advertising or messaging based on those inferences.

140. A reasonable person would find the undisclosed tracking and disclosure of such sensitive healthcare information—including vaccine-related activity—to third parties for commercial purposes to be highly offensive and an egregious invasion of privacy.

141. The privacy of such information was material to Plaintiffs and Class Members. Plaintiffs and Class Members would not have used Defendant's Website, would not have provided their Private Information, and would not have paid for Defendant's healthcare services—or would have paid less—had they known that Defendant would disclose their Private Information to third parties for commercial purposes.

142. Plaintiffs' and Class Members' reasonable expectations of privacy are grounded in, among other things, Defendant's status as a healthcare provider; its common law duty to maintain the confidentiality of patient information; federal and state laws protecting the privacy of medical information, communications, and personal data; and Defendant's express and implied promises of confidentiality.

**J. Defendant Was Enriched and Benefitted from the Use of The Tracking Technologies and Unauthorized Disclosures.**

143. One of the primary reasons that Defendant decided to embed the Tracking Technologies on its Website was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data in the absence of express written consent.

144. Defendant's use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.

145. In exchange for disclosing the Private Information of its patients, Defendant is compensated by Adobe in the form of enhanced advertising services and more cost-efficient

35

CLASS ACTION COMPLAINT

marketing.

146. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

147. The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Adobe via the Tracking Technologies embedded on, in their case, Defendant's Website.

148. For example, when a user makes (or even attempts to make) a vaccine appointment on the Website, that information is sent to Adobe. Adobe can then use its data on the user to find more users to click on a Walgreens ad and ensure that those users targeted are more likely to convert.

149. Adobe is not limited to using that information only in the service of Walgreens. Once Adobe obtains new information about a person through its Tracking Technologies, that information is instantly read and assimilated by Adobe, who then integrates it into that person's data profile so that Adobe can target that person with ads by other companies as well.

150. Through their process, the Tracking Technologies load and capture as much data as possible when a user loads the Website that has installed such technologies. The information captures, includes the patient's persistent identifier that has been assigned by Adobe and vaccine appointment information.

151. As part of its marketing campaign, Defendant re-targeted patients and potential patients to get more visitors to its Website to use its services. Defendant did so through use of the intercepted patient data it obtained, procured and/or disclosed in the absence of express written consent.

152. But companies have started to warn about the potential HIPAA violations associated with using such tracking technologies because many such trackers are not HIPAA-compliant or are only HIPAA-compliant if certain steps are taken.

153. Medico Digital warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly,

CLASS ACTION COMPLAINT

it could have serious consequences."[31]

154. By utilizing the Tracking Technologies, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiffs and Class Members and violating their rights under federal, Illinois, and California law.

**K. Plaintiffs' and Class Members' Private Information Had Financial Value.**

155. Plaintiffs' Private Information has economic value and Defendant's disclosures harmed Plaintiffs and Class Members.

156. Adobe regularly uses the data that it acquires and then sells that information to advertising clients.

157. Plaintiffs' and Class Members' Private Information have considerable value as highly monetizable data especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

158. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view their information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[32]

159. Various reports have been conducted to identify the value of health data. For example, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at

---

[31] *The Complex World of Healthcare Retargeting*, MEDICO DIGITAL (July 10, 2023), https://www.medicodigital.com/insights/the-complicated-world-of-healthcare-retargeting/ (last visited Dec. 29, 2025).

[32] Paul M. Schwartz, Property, Privacy, and Personal Data, 117 *Harv. L. Rev.* 2055, 2056-57 (2004).

CLASS ACTION COMPLAINT

fair market value to mitigate any regulatory risk."[33]

160. Trustwave Global Security also published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[34]

161. The value of health data has also been reported extensively in the media. For example, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[35]

162. Similarly, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[36]

163. Indeed, numerous marketing services and consultants offer advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to

---

[33] *See* Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, Health Capital (2017), https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf.

[34] *See* Imprivata, *Hackers, Breaches, and the Value of Healthcare Data* (June 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (citing Trustwave, *The Value of Data* (2017), https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf) (last visited Dec. 29, 2025).

[35] *See* Christina Farr, *Hospital Execs Say They Are Getting Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Dec. 29, 2025).

[36] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ (last visited Dec. 29, 2025).

CLASS ACTION COMPLAINT

offer a book, guide, webinar, course or something else valuable."[37]

164. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

165. Their economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use.

166. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data.

167. Several companies, such as Google, Nielsen, UpVoice, HoneyGain and SavvyConnect, have products through which they pay consumers for a license to track their data.

168. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[38]

169. These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

170. Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, it can take years to undo the damage caused.

171. In short, there is a quantifiable economic value to Internet users' data that is greater

---

[37] Vero, *Twitter Lead Generation Cards*, https://www.getvero.com/resources/twitter-lead-generation-cards/ (last visited Dec. 29, 2025).

[38] *See* Imprivata, *Hackers, Breaches, and the Value of Healthcare Data* (June 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (citing Trustwave, *The Value of Data* (2017), https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf) (last visited Dec. 29, 2025).

CLASS ACTION COMPLAINT

than zero. The exact number will be a matter for experts to determine.

172. Defendant gave away Plaintiffs' and Class Members' communications and transactions on its Website without permission.

173. The unauthorized access to Plaintiffs' and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website users, including Plaintiffs and Class Members.

## PLAINTIFF ALLEGATIONS

### *Experience of Plaintiff N.G.*

174. Plaintiff N.G. is a customer of Walgreens who used Walgreens' Website to schedule vaccination appointments, including in May 2022.

175. When she made the appointments, and as a condition of receiving Defendant's services, Plaintiff N.G. was asked to fill out a detailed online form on the Website.

176. Without Plaintiff N.G.'s knowledge or consent, every time that she made a vaccination appointment via the Website, the Tracking Technologies Defendant deployed, including the Adobe tracking technologies, shared her PHI with third parties, including (1) her status as a patient, (2) the fact that she had made a vaccine appointment, and (3) the name of the specific vaccine she was receiving, the COVID-19 vaccine.

177. Plaintiff N.G. has used and continues to use the same devices to maintain and access the Website throughout the relevant period in her case.

178. Along with this PHI, Walgreens also shared data that allowed Adobe and other third parties to specifically identify Plaintiff N.G., including through the use of the Adobe Experience Platform Identity, her IP Address, MID, ECID, TDID, and other persistent unique identifiers.

179. As a result of N.G.'s deployment of Tracking Technologies, Adobe was able to link Plaintiff N.G.'s PHI with her real-world identity and then exploit her PHI for its commercial gain.

### *Experience of Plaintiff R.L.*

180. Plaintiff R.L. is a customer of Walgreens who used Walgreens' Website to schedule vaccination appointments, including September 2024.

181. When she made the appointments, and as a condition of receiving Defendant's

40

CLASS ACTION COMPLAINT

services, Plaintiff R.L. was asked to fill out a detailed online form on the Website.

182. Without Plaintiff R.L.'s knowledge or consent, every time that she made a vaccination appointment via the Website, the Tracking Technologies Defendant deployed, including the Adobe tracking technologies, shared her PHI with third parties, including (1) her status as a patient, (2) the fact that she had made a vaccine appointment, and (3) the name of the specific vaccine she was receiving, the COVID-19 vaccine.

183. Plaintiff R.L. has used and continues to use the same devices to maintain and access the Website throughout the relevant period in their case.

184. Along with this PHI, Walgreens also shared data that allowed Adobe and other third parties to specifically identify Plaintiff R.L., including through the use of the Adobe Experience Platform Identity, her IP Address, MID, ECID, TDID, and other persistent unique identifiers.

185. As a result of Walgreen's deployment of Tracking Technologies on its Website, Adobe was able to link Plaintiff R.L.'s PHI with her real-world identity and then exploit her PHI for its commercial gain.

***Experience of Plaintiff R.S.***

186. Plaintiff R.S. is a customer of Walgreens who used Walgreens' Website to schedule vaccination appointments, including November 2021.

187. When he made the appointments, and as a condition of receiving Defendant's services, Plaintiff R.S. was asked to fill out a detailed online form on the Website.

188. Without Plaintiff R.S.'s knowledge or consent, every time that he made a vaccination appointment via the Website, the Tracking Technologies Defendant deployed, including the Adobe tracking technologies, shared his PHI with third parties, including (1) his status as a patient, (2) the fact that he had made a vaccine appointment, and (3) the name of the specific vaccine he was receiving, the COVID-19 vaccine.

189. Plaintiff R.S. has used and continues to use the same devices to maintain and access the Website throughout the relevant period in their case.

190. Along with this PHI, Walgreens also shared data that allowed Adobe to specifically identify Plaintiff R.S., including through the use of the Adobe Experience Platform Identity, his IP

41

CLASS ACTION COMPLAINT

Address, MID, ECID, TDID and other persistent unique identifiers.

191. As a result of Walgreen's deployment of Tracking Technologies on its Website, Adobe was able to link Plaintiff R.S.'s PHI with his real-world identity and then exploit his PHI for its commercial gain.

***Experience of Plaintiff I.P.***

192. Plaintiff I.P. is a customer of Walgreens who used Walgreens' Website to schedule vaccination appointments, including September 2024.

193. When she made the appointments, and as a condition of receiving Defendant's services, Plaintiff I.P. was asked to fill out a detailed online form on the Website.

194. Without Plaintiff I.P.'s knowledge or consent, every time that she made a vaccination appointment via the Website, the Tracking Technologies Defendant deployed, including the Adobe tracking technologies, shared her PHI with third parties, including (1) her status as a patient, (2) the fact that she had made a vaccine appointment, and (3) the name of the specific vaccine she was receiving, the hepatitis, polio, typhoid, and yellow fever vaccines.

195. Plaintiff I.P. has used and continues to use the same devices to maintain and access the Website throughout the relevant period in their case.

196. Along with this PHI, Walgreens also shared data that allowed Adobe and other third parties to specifically identify Plaintiff I.P., including through the use of the Adobe Experience Platform Identity, her IP Address, MID, ECID, TDID, and other persistent unique identifiers.

197. As a result of Walgreen's deployment of Tracking Technologies on its Website, Adobe was able to link Plaintiff I.P.'s PHI with her real-world identity and then exploit her PHI for its commercial gain.

198. Plaintiffs reasonably expected that their communications with Defendant via the Website were confidential, solely between themselves and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

199. However, as a result of the Defendant choosing to install the Tracking Technologies on its Website, Plaintiffs Private Information was intercepted, disclosed, viewed, analyzed and used by unauthorized third parties.

CLASS ACTION COMPLAINT

200. Defendant transmitted Plaintiffs' IP Address, MID, ECID, TDID, and other persistent unique identifiers to Adobe. Defendant also transmitted information such as health and medical information including the type of medical treatment sought by Plaintiffs and the fact that Plaintiffs attempted to or did book a vaccine appointment.

201. Plaintiffs never consented to the disclosure of or use of their Private Information by third parties or to Defendant enabling third parties, including Adobe, to access or interpret such information. Plaintiffs never consented to any third parties' receipt or use of their Private Information.

202. Notwithstanding, through the Tracking Technologies embedded on Defendant's Website, Defendant transmitted Plaintiffs Private Information to, at a minimum, Adobe and likely many other third parties.

203. As a result, Plaintiffs received targeted ads online related to their specific medical conditions and/or treatments, including but not limited to their vaccinations sought.

204. By making these disclosures without their consent, Defendant breached Plaintiffs privacy and unlawfully disclosed their Private Information.

205. Defendant did not inform Plaintiffs that it had shared their Private Information with Adobe.

206. Plaintiffs have a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

**TOLLING**

207. The applicable statutes of limitation have been tolled because of Walgreens' knowing and active concealment of the facts alleged herein.

208. Defendant seamlessly incorporated Tracking Technologies into the Website offering vaccine appointments, providing no indication to Plaintiffs or Class Members that their PHI and PII were being disclosed. Defendant intentionally concealed that, by interacting with the Website, Plaintiffs' and Class Members' PHI and PII would be intercepted, collected, used by, and disclosed to third parties. Defendant's fraudulent concealment of their efforts to share PHI and PII with third

43
CLASS ACTION COMPLAINT

parties (including information that specifically identified patients' real-world identities) violated the duties that Defendant owed Plaintiffs and Class Members, tolling the statute of limitations.

209. Plaintiffs and Class Members could not, with due diligence, discover the full scope of Defendant's conduct, because there were no disclosures or other indication that they were interacting with a website that employed Tracking Technologies.

210. The earliest Plaintiffs and Class Members could have known about Defendant's conduct was approximately in March 2026, when Plaintiffs contacted the undersigned counsel to discuss their potential claims against Defendant.

211. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Additionally, Defendant were under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

212. Plaintiffs bring their action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

The Nationwide Class that Plaintiffs seek to represent is defined as:

All individuals residing in the United States who used Defendant's Website to make a vaccine appointment.

The California Subclass that Plaintiffs seek to represent is defined as:

All individuals residing in the State of California who used Defendant's Website to make a vaccine appointment.

213. The Nationwide Class and California Subclass are collectively referred to as the "Class" unless otherwise and more specifically identified.

214. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates their case, including their staff and immediate family.

215. Plaintiffs reserve the right to modify or amend the definition of the proposed class

44

CLASS ACTION COMPLAINT

before the Court determines whether certification is appropriate.

216. Numerosity, Fed R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Adobe, and the Class is identifiable within Defendant's records.

217. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members because Defendant engaged in a uniform course of conduct by implementing the same tracking technologies across its Website, which operated in the same manner for all users. These questions are capable of classwide resolution because they can be answered through common evidence, including Defendant's source code, configuration of Tracking Technologies, and standardized data flows applicable to all Class Members. These common questions include, without limitation:

a.  Whether Defendant implemented Tracking Technologies, including Adobe Analytics and related tools, that caused users' interactions with Defendant's Website to be transmitted to Adobe;

b.  Whether Defendant's Tracking Technologies transmitted users' interactions—including vaccine-related webpages visited, selections made, and associated identifiers—to Adobe contemporaneously with those interactions;

c.  Whether the information transmitted to Adobe constituted the "contents" of communications or, alternatively, dialing, routing, addressing, or signaling information;

d.  Whether Defendant's conduct constituted an interception, acquisition, or disclosure of Plaintiffs' and Class Members' communications;

e.  Whether Defendant disclosed Plaintiffs' and Class Members' Private Information to Adobe and whether such disclosure extended beyond Adobe into the broader advertising ecosystem;

f.  Whether Defendant obtained informed consent from Plaintiffs and Class Members for the transmission of their healthcare-related interactions to Adobe;

g.  Whether Plaintiffs and Class Members had a reasonable expectation of privacy in their

45
CLASS ACTION COMPLAINT

interactions with Defendant's Website, including vaccine scheduling and other healthcare-related activities;

h.    Whether Defendant's conduct constitutes an intrusion upon seclusion or public disclosure of private facts under applicable law;

i.    Whether Defendant's conduct was highly offensive to a reasonable person, particularly in light of the sensitive healthcare-related nature of the information at issue;

j.    Whether Defendant's conduct was unlawful, unfair, or deceptive;

k.    Whether Defendant acted intentionally or with reckless disregard in implementing and operating the Tracking Technologies at issue;

l.    Whether Plaintiffs and Class Members are entitled to statutory, actual, consequential, or nominal damages as a result of Defendant's conduct; and

m.    Whether Plaintiffs and Class Members are entitled to injunctive and declaratory relief to prevent Defendant's ongoing collection, transmission, and use of their Private Information.

218.    Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because they all had their Private Information compromised as a result of Defendant's incorporation of the Adobe Tracking Technologies, due to Defendant's misfeasance.

219.    Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute their action vigorously.

220.    Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims

CLASS ACTION COMPLAINT

in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

221.    Policies Generally Applicable to the Class. Fed. R. Civ. P. 23(b)(2). Their class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

222.    The nature of their action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of their litigation.

223.    The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting their lawsuit as a class action.

47
CLASS ACTION COMPLAINT

224. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

225. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in their Complaint.

226. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

227. Issue Certification, Fed. R. Civ. P. 23(c)(4). In the alternative, and in addition to certification of the Class as a whole, certification of particular issues is appropriate because resolution of these common issues on a classwide basis will materially advance the disposition of their litigation. These issues are capable of determination through common proof, including Defendant's source code, configuration of its Tracking Technologies, and standardized data flows applicable to all Class Members. These issues do not depend on individualized user behavior, but instead turn on Defendant's uniform implementation of Tracking Technologies and standardized data collection practices. Such issues include, but are not limited to:

    a.    Whether Defendant implemented Tracking Technologies, including Adobe Analytics and related tools, that caused users' interactions with Defendant's Website to be transmitted to Adobe;

    b.    Whether Defendant's Tracking Technologies transmitted users' interactions—including vaccine-related webpages visited, selections made, and associated identifiers—to Adobe contemporaneously with those interactions;

    c.    Whether the information transmitted to Adobe constitutes the "contents" of communications or, alternatively, dialing, routing, addressing, or signaling information;

    d.    Whether Defendant's conduct constituted an interception, acquisition, or disclosure of Plaintiffs' and Class Members' communications;

48

CLASS ACTION COMPLAINT

e.      Whether Defendant disclosed Plaintiffs' and Class Members' Private Information to Adobe and whether such disclosure extended beyond Adobe into the broader advertising ecosystem;

f.      Whether Defendant obtained informed consent from Plaintiffs and Class Members for the transmission of their healthcare-related interactions to Adobe;

g.      Whether Plaintiffs' and Class Members' interactions with Defendant's Website, including vaccine scheduling, involve private matters entitled to protection under applicable privacy laws;

h.      Whether Defendant's conduct constitutes an intrusion upon seclusion or public disclosure of private facts;

i.      Whether Defendant's conduct was highly offensive to a reasonable person in light of the sensitive healthcare-related nature of the information at issue; and

j.      Whether Defendant acted intentionally or with reckless disregard in implementing and operating the Tracking Technologies at issue.

## CAUSES OF ACTION

### COUNT I
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1) *et seq.***
**UNAUTHORIZED INTERCEPTION, USE AND DISCLOSURE**
***(On Behalf of Plaintiffs & the Nationwide Class)***

228.   Plaintiffs, on behalf of themselves and the Class designated immediately above (for the purposes of this Count, "Class Members"), repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

229.   The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

230.   The ECPA protects both sending and receipt of communications.

231.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

232.   The transmissions of Plaintiffs' Private Information to Defendant via Defendant's

49

CLASS ACTION COMPLAINT

Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

233.   The transmissions of Plaintiffs' Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

234.   **Electronic Communications**. The transmission of Private Information between Plaintiffs and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

235.   **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

236.   **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

237.   **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

238.   The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.   The Adobe Tracking Technology used to track Plaintiffs' and Class Members' communications;

    b.   Plaintiffs' and Class Members' browsers;

    c.   Plaintiffs' and Class Members' computing devices;

    d.   Defendant's web-servers and

    e.   The Tracking Technologies deployed by Defendant to effectuate the sending and acquisition of patient communications.

239.   Whenever Plaintiffs and Class Members interacted with Defendant's Website,

50

CLASS ACTION COMPLAINT

Defendant, through the Tracking Technologies embedded and operating on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs' and Class Members' electronic communications to third parties, including Adobe, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

240. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies embedded and operating on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiffs' and Class Members' electronic communications, for purposes other than providing health care services to Plaintiffs and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

241. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies it embedded and operated on its Website, contemporaneously and intentionally redirected and disclosed the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Adobe.

242. Defendant's intercepted communications include, but are not limited to, the contents of communications to and/or from Plaintiffs' and Class Members' regarding PII and PHI, including vaccination requests and scheduling.

243. Additionally, through the above-described Tracking Technologies and intercepted communications, their information was, in turn, used by third parties, including Adobe, to 1) place Plaintiffs in specific health-related categories/segments and 2) target Plaintiffs with particular advertising associated with Plaintiffs' specific health conditions.

244. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

245. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

246. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Technologies to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

247. Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

248. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Tracking Technologies.

249. Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

250. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State, such as California—namely, violations of HIPAA and invasion of privacy, among others.

251. **Any party exception in 18 U.S.C. § 2511(2)(d) does not apply.** The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

252. Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding and disclosure of Plaintiffs' and Class Members' Private Information, separate from the interception of that information, does not qualify for the party exemption.

253. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). Their provision imposes a criminal penalty for knowingly disclosing individually identifiable health information (IIHI) to a

52

CLASS ACTION COMPLAINT

third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) *relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual*, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[39]

254. Plaintiffs' information that Defendant disclosed to third parties qualifies as IIHI. Defendant also violated Plaintiffs' expectations of privacy and violated 42 U.S.C. § 1320d(6), which constitutes tortious and/or criminal conduct. Defendant disclosed the wire or electronic communications to Adobe and potentially other third parties to increase its profit margins. Defendant specifically used the Adobe Tracking Technology to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

255. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

256. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

    a.   Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

    b.   Disclosed IIHI to Adobe without patient authorization.

257. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Adobe source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

258. Healthcare patients have the right to rely upon the promises that companies make to them. Defendant accomplished its tracking and retargeting through deceit and disregard, such that

---

[39] § 1320d-(6) (emphasis added).

53

an actionable claim may be made, in that it was accomplished through source code that cause Adobe Tracking Technology, including, but not limited to, patient's assigned MID, ECID, TDID and other tracking technologies to be deposited on Plaintiffs' and Class Members' computing devices as "first-party" cookies that are not blocked.

259.    The Tracking Technologies, which constitute programs, commanded Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Adobe.

260.    Defendant knew or had reason to know that the Adobe Tracking Technology would command Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Adobe and others.

261.    Defendant's scheme or artifice to defraud in their action consists of: (a) the false and misleading statements and omissions in its privacy policy (HIPAA Notice) set forth above, including the statements and omissions recited in the claims below and (b) the placement of the 'Demdex" cookie on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Adobe.

262.    Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiffs' and Class Members' property rights (a) to the confidentiality of Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes and (b) to determine who has access to their computing devices.

263.    Moreover, Defendant wiretapped Plaintiffs and Class Members for the purpose of committing the invasion of privacy torts alleged herein—including for the purpose of disclosing their Private Information to third parties such as Adobe in exchange for valuable consideration, including valuable analytics and advertising services.

264.    As such, Defendants cannot viably claim any exception to ECPA liability.

265.    Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

    a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used

CLASS ACTION COMPLAINT

their individually identifiable patient health information, including information about their vaccination appointments, for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' individually identifiable patient health information without providing any value or benefit to Plaintiffs or the Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' individually identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, without providing any value or benefit to Plaintiffs or the Class Members;

d. Defendant has failed to provide Plaintiffs and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e. The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as vaccination appointments that Plaintiffs and Class Members intended to remain private no longer private.

266.   As a result of Defendant's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT II**
**INVASION OF PRIVACY – PUBLIC DISCLOSURE OF PRIVATE FACTS**
**UNDER ILLINOIS LAW**
*(On Behalf of Plaintiffs and the Nationwide Class)*

267.   Plaintiffs, on behalf of themselves and the Class designated immediately above (for the purposes of this Count, "Class Members"), repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

268. Plaintiffs and Class Members disclosed private and sensitive information to Defendant in the course of seeking healthcare services, including interactions relating to vaccine scheduling and other medical care.

269. Their information included confidential details regarding Plaintiffs' healthcare interests, treatment-seeking behavior, and interactions with Defendant's Website, which constitute private facts not intended for public dissemination.

270. Defendant disclosed these private facts to a third party, Adobe, by embedding tracking technologies on its Website that caused Plaintiffs' and Class Members' communications to be transmitted to Adobe contemporaneously with their interactions.

271. The disclosure was not limited to a confidential or isolated recipient. Adobe operates a large-scale data collection, profiling, and advertising ecosystem that aggregates user data and uses it to create and refine user profiles for marketing, analytics, and targeted advertising purposes.

272. Through their system, the information disclosed by Defendant was incorporated into Adobe's broader data infrastructure and made available for use in audience creation, behavioral targeting, and advertising activities across platforms and services beyond Defendant's Website.

273. As a result, Defendant's disclosure of Plaintiffs' and Class Members' private health-related information was effectively public, in that it was shared with and utilized within a system designed to broadly disseminate and exploit such information.

274. The private facts disclosed—relating to Plaintiffs' healthcare activities—are highly sensitive and would be highly offensive to a reasonable person if disclosed in their manner.

275. The disclosed information is not of legitimate public concern.

276. Defendant acted intentionally, or at a minimum with reckless disregard, in implementing tracking technologies that disclosed Plaintiffs' and Class Members' private information to Adobe for marketing and analytics purposes.

277. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members suffered harm, including invasion of privacy and loss of control over their personal information.

278. Plaintiffs and Class Members seek compensatory damages, injunctive relief, and all other relief available under the law.

**COUNT III**

**INVASION OF PRIVACY – PUBLIC DISCLOSURE OF PRIVATE FACTS
UNDER CALIFORNIA LAW**
*(On Behalf of Plaintiffs and the California Subclass, or in the alternative, on behalf of the Nationwide Class)*

279.   Plaintiffs, on behalf of themselves and the Class designated immediately above (for the purposes of this Count, "Class Members"), repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

280.   Plaintiffs and Class Members disclosed private and sensitive information to Defendant in the course of seeking healthcare services, including interactions relating to vaccine scheduling and other medical care.

281.   Their information included confidential details regarding Plaintiffs' and Class Members' healthcare interests, treatment-seeking behavior, and interactions with Defendant's Website, which constitute private facts not intended for public dissemination.

282.   Defendant publicly disclosed these private facts by transmitting Plaintiffs' and Class Members' healthcare-related interactions to a third party, Adobe, through embedded tracking technologies operating on Defendant's Website.

283.   Their disclosure occurred when Defendant's Website caused Plaintiffs' and Class Members' browsers to transmit information—including vaccine-related webpages visited, selections made, and associated identifiers—to Adobe contemporaneously with their interactions.

284.   The disclosure was not limited to a confidential or restricted recipient. Adobe operates a large-scale data collection, profiling, and advertising ecosystem that aggregates user data and uses it to create and refine user profiles for marketing, analytics, and targeted advertising purposes.

285.   Through their system, the information disclosed by Defendant was incorporated into Adobe's broader data infrastructure and made available for use in audience creation, behavioral targeting, and advertising activities across platforms and services beyond Defendant's Website.

286.   As a result, Defendant's disclosure of Plaintiffs' and Class Members' private information was effectively public, in that it exposed their healthcare-related data to a system designed for widespread use and dissemination beyond Defendant's control.

287.   Adobe incorporates such data into profiles that are used by multiple customers and

57

partners for advertising, analytics, and audience targeting, including across websites and platforms beyond Defendant's control. As a result, and specifically due to Defendant's intentional installation and configuration of the Adobe Tracking Technologies onto its Website, Plaintiffs' and Class Members' vaccine scheduling information was effectively disseminated beyond Adobe to additional entities within the digital advertising ecosystem.

288.   Courts have recognized that disclosures within digital advertising ecosystems—such as environments where user data is shared across multiple entities for advertising and profiling purposes—can satisfy the publicity element of their claim. Here, Defendant's disclosure similarly placed Plaintiffs' and Class Members' private information into a system designed for broad dissemination and use.

289.   The private facts disclosed—relating to Plaintiffs' and Class Members' healthcare activities, including efforts to obtain vaccinations and the types of vaccinations—are highly sensitive and would be highly offensive to a reasonable person if disclosed in their manner.

290.   The disclosed information is not of legitimate public concern.

291.   Defendant acted intentionally, or at a minimum with reckless disregard, in implementing tracking technologies that disclosed Plaintiffs' and Class Members' private information to Adobe for marketing and analytics purposes.

292.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members suffered harm, including invasion of privacy and loss of control over their personal information.

293.   Plaintiffs and Class Members seek compensatory damages, injunctive relief, and all other relief available under the law.

### COUNT IV
**INVASION OF PRIVACY - INTRUSION UPON SECLUSION UNDER CALIFORNIA LAW**
***(On Behalf of Plaintiffs and the California Subclass, or in the alternative, the Nationwide Class)***

294.   Plaintiffs, on behalf of themselves and the California Subclass, repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

295.   Plaintiffs and California Subclass Members possess a legally protected privacy interest in their communications with Defendant concerning healthcare services, including their

CLASS ACTION COMPLAINT

interactions with Defendant's Website to research and schedule vaccinations. These interactions reflect private matters concerning their health, medical interests, and treatment-seeking behavior.

296. Plaintiffs and California Subclass Members had a reasonable expectation of privacy in these communications. Although Defendant's Website is publicly accessible, Plaintiffs and California Subclass Members reasonably expected that their healthcare-related interactions would remain confidential and would not be intercepted or transmitted to third parties for marketing or analytics purposes.

297. Defendant intentionally intruded upon Plaintiffs' and California Subclass Members' private affairs by deploying Tracking Technologies that caused their communications with Defendant's Website to be intercepted and transmitted to a third party, Adobe, without their knowledge or consent.

298. Their intrusion occurred when Defendant's embedded tracking code caused Plaintiffs' and California Subclass Members' browsers to transmit information regarding their interactions—including vaccine-related webpages visited, selections made, and associated identifiers—to Adobe contemporaneously with those communications.

299. By causing these simultaneous transmissions, Defendant enabled Adobe to monitor and acquire Plaintiffs' and California Subclass Members' communications in real time, effectively allowing a third party to eavesdrop on their interactions with Defendant's Website.

300. Plaintiffs' and California Subclass Members' interactions with Defendant's vaccine scheduling tools revealed highly sensitive information about their healthcare activities. Unlike generalized browsing of publicly available information, these interactions conveyed specific information about Plaintiffs' intent to obtain medical treatment.

301. Defendant's intrusion would be highly offensive to a reasonable person. In determining offensiveness, relevant factors include the nature of the information, the degree of intrusion, Defendant's motives, and prevailing social norms. Here, Defendant's conduct involved the surreptitious, real-time interception of healthcare-related communications for marketing and analytics purposes, in violation of widely recognized expectations of medical confidentiality.

302. The intrusion is particularly egregious because it involved sensitive health-related

CLASS ACTION COMPLAINT

information and occurred in the context of interactions with a healthcare provider, where users reasonably expect a heightened level of privacy.

303. Defendant acted intentionally, or at a minimum with reckless disregard, in implementing Tracking Technologies designed to capture and transmit users' healthcare-related interactions to a third party.

304. Defendant did not obtain Plaintiffs' or California Subclass Members' informed consent to these intrusions. Any purported disclosures were insufficient to inform users that their healthcare-related interactions would be intercepted and transmitted to third parties in real time, and Defendant did not obtain affirmative assent to such practices.

305. As a direct and proximate result of Defendant's conduct, Plaintiffs and California Subclass Members suffered harm, including invasion of privacy and loss of control over their personal information. Plaintiffs and California Subclass Members seek compensatory damages, injunctive relief, and all other relief available under the law.

## COUNT V
### INVASION OF PRIVACY—CALIFORNIA CONSTITUION
### ART. 1 § 1
### *(On behalf of Plaintiffs & the California Subclass)*

306. Plaintiffs, on behalf of themselves and the California Subclass, repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

307. Plaintiffs and California Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiffs' and California Subclass Members' knowledge or consent.

308. At all relevant times, by using Adobe's Tracking Technologies to record and communicate patients' IP Address, MID, ECID, TDID and other individually identifying information alongside their confidential scheduling for medical services, Defendant intentionally invaded Plaintiffs' and California Subclass Members' privacy rights under the California

Constitution.

309.    Plaintiffs and California Subclass Members had a reasonable expectation that their communications, identity, health information, and other data would remain confidential, and that Defendant would not install wiretaps on its Website to secretly transmit communications to a third party.

310.    Plaintiffs and California Subclass Members did not authorize Defendant to record and transmit Plaintiffs' and California Subclass Members' private medical communications alongside their personally identifiable health information.

311.    Their invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

312.    As a result of Defendant's actions, Plaintiffs and California Subclass Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

313.    Plaintiffs and California Subclass Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages and an injunction that prevents Defendant from engaging in the same or similar conduct in the future.

314.    Plaintiffs and California Subclass Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and California Subclass Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiffs' and California Subclass Members' privacy.

315.    Plaintiffs and California Subclass Members are further entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and California Subclass Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

316.    Plaintiffs seek all other relief as the Court may deem just, proper, and available for invasion of privacy under the California Constitution.

**COUNT VI**
**NEGLIGENCE UNDER ILLINOIS LAW**
*(On behalf of Plaintiffs & the Nationwide Class)*

317. Plaintiffs, on behalf of themselves and the Class designated immediately above (for the purposes of this Count, "Class Members"), repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

318. Defendant owed Plaintiffs and Class Members a duty to exercise reasonable care in collecting, maintaining, using, and safeguarding their Private Information, including sensitive medical and health-related information, and to refrain from disclosing the contents of their communications without authorization. This duty arises from, inter alia, Defendant's role as a healthcare provider, its representations and policies regarding patient confidentiality, the foreseeability that unauthorized disclosures of medical information would cause harm to patients, Illinois common law, and the Illinois Personal Information Protection Act.

319. This duty is further informed by widely recognized privacy standards governing healthcare information, including the requirements and expectations embodied in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations. While HIPAA does not provide a private right of action, it reflects the standard of care applicable to healthcare entities and underscores the well-established expectation that patient medical information and communications will remain confidential and not be disclosed for non-treatment, non-payment, or non-healthcare operations purposes without authorization.

320. Plaintiffs and Class Members had reasonable and well-founded expectations of privacy in their communications with Defendant, including communications exchanged through Defendant's Website concerning medical conditions, treatments, and services such as vaccinations—matters that are particularly sensitive and widely understood to be private.

321. Defendant breached its duties by, among other things, designing, implementing, and operating its Website to include Tracking Technologies that intercepted, disclosed, and transmitted Plaintiffs' and Class Members' communications and Private Information to third parties without authorization. These disclosures included the contents of communications and associated identifiers that enabled third parties to attribute such information to specific individuals.

62

CLASS ACTION COMPLAINT

322. Defendant further breached its duties by failing to implement reasonable safeguards, controls, and oversight to prevent such disclosures, despite the known and foreseeable risks associated with deploying third-party tracking technologies on webpages involving sensitive medical information. Industry guidance, regulatory enforcement actions, and Defendant's own obligations made clear that such technologies posed a substantial risk of unauthorized disclosure of protected health information.

323. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were not necessary to provide medical care or services. The third-party recipients included, but are not limited to, Adobe and other analytics and advertising entities.

324. Defendant knew or should have known that its conduct would result in the unauthorized disclosure of Plaintiffs' and Class Members' Private Information and communications, and that such disclosures would cause harm, including loss of privacy, misuse of sensitive information, and commercialization of patient data.

325. As a direct and proximate result of Defendant's breaches, Plaintiffs and Class Members have suffered and will continue to suffer injury, including but not limited to:

- The loss of privacy and confidentiality in their sensitive medical and personal information;

- The unauthorized disclosure of the contents of their communications;

- Diminution in the value of their Private Information;

- The invasion of their legally protected interests in maintaining the confidentiality of their medical information;

- Exposure to targeted advertising, profiling, and data aggregation based on sensitive health-related information;

- Time and effort spent mitigating the consequences of Defendant's conduct and protecting their privacy;

- The loss of the benefit of the bargain for medical services that included, as a material component, the safeguarding of confidential information; and

CLASS ACTION COMPLAINT

- Defendant's unjust enrichment through the exploitation and monetization of Plaintiffs' and Class Members' Private Information.

326. These injuries were the foreseeable and natural consequence of Defendant's failure to exercise reasonable care in safeguarding Plaintiffs' and Class Members' Private Information and communications.

327. Critically, Defendant's conduct was uniform as to Plaintiffs and Class Members: Defendant implemented the same or substantially similar Tracking Technologies across its Website, resulting in the systematic and contemporaneous disclosure of communications and Private Information to the same categories of third parties. Accordingly, Plaintiffs' and Class Members' injuries arise from a common course of conduct and can be proven through common evidence, including Defendant's configurations, vendor integrations, and data flows.

328. As a result of Defendant's negligent conduct, Plaintiffs and Class Members seek all damages available under Illinois law, including:

- Compensatory damages in an amount to be determined at trial, including damages for loss of privacy, loss of the value of their Private Information, and loss of the benefit of their bargain;

- General damages for the invasion of their privacy rights and the unauthorized disclosure of confidential medical information, which are capable of classwide measurement based on Defendant's uniform conduct;

- Damages for time, effort, and expenses incurred in mitigating the effects of Defendant's conduct;

- Restitution and disgorgement of all revenues, profits, and other benefits Defendant obtained as a result of its unlawful conduct, which can be calculated on a classwide basis;

- Statutory or nominal damages, as appropriate, for each violation; and

- All other relief the Court deems just and proper.

//

//

64

CLASS ACTION COMPLAINT

## COUNT VII
## NEGLIGENCE UNDER CALIFORNIA LAW
### *(On behalf of Plaintiffs & the Nationwide Class, or in the alternative, on behalf of the California Subclass)*

329.   Plaintiffs, on behalf of themselves and the Class designated immediately above (for the purposes of this Count, "Class Members"), repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

330.   Defendant owed Plaintiffs and Class Members a duty to exercise reasonable care in collecting, maintaining, using, and safeguarding their Private Information, including sensitive medical and health-related information, and to refrain from disclosing the contents of their communications without authorization. This duty arises from, inter alia, Defendant's role as a healthcare provider, its representations and policies regarding patient confidentiality, the foreseeability that unauthorized disclosures of medical information would cause harm to patients, the California Confidentiality of Medical Information Act, and California common law.

331.   This duty is further informed by widely recognized privacy standards governing healthcare information, including the requirements and expectations embodied in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations. While HIPAA does not provide a private right of action, it reflects the standard of care applicable to healthcare entities and underscores the well-established expectation that patient medical information and communications will remain confidential and not be disclosed for non-treatment, non-payment, or non-healthcare operations purposes without authorization.

332.   Plaintiffs and Class Members had reasonable and well-founded expectations of privacy in their communications with Defendant, including communications exchanged through Defendant's Website concerning medical conditions, treatments, and services such as vaccinations—matters that are particularly sensitive and widely understood to be private.

333.   Defendant breached its duties by, among other things, designing, implementing, and operating its Website to include Tracking Technologies that intercepted, disclosed, and transmitted Plaintiffs' and Class Members' communications and Private Information to third parties without

65

CLASS ACTION COMPLAINT

authorization. These disclosures included the contents of communications and associated identifiers that enabled third parties to attribute such information to specific individuals.

334.    Defendant further breached its duties by failing to implement reasonable safeguards, controls, and oversight to prevent such disclosures, despite the known and foreseeable risks associated with deploying third-party tracking technologies on webpages involving sensitive medical information. Industry guidance, regulatory enforcement actions, and Defendant's own obligations made clear that such technologies posed a substantial risk of unauthorized disclosure of protected health information.

335.    These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were not necessary to provide medical care or services. The third-party recipients included, but are not limited to, Adobe and other analytics and advertising entities.

336.    Defendant knew or should have known that its conduct would result in the unauthorized disclosure of Plaintiffs' and Class Members' Private Information and communications, and that such disclosures would cause harm, including loss of privacy, misuse of sensitive information, and commercialization of patient data.

337.    As a direct and proximate result of Defendant's breaches, Plaintiffs and Class Members have suffered and will continue to suffer injury, including but not limited to:

- The loss of privacy and confidentiality in their sensitive medical and personal information;

- The unauthorized disclosure of the contents of their communications;

- Diminution in the value of their Private Information;

- The invasion of their legally protected interests in maintaining the confidentiality of their medical information;

- Exposure to targeted advertising, profiling, and data aggregation based on sensitive health-related information;

- Time and effort spent mitigating the consequences of Defendant's conduct and protecting their privacy;

CLASS ACTION COMPLAINT

- The loss of the benefit of the bargain for medical services that included, as a material component, the safeguarding of confidential information; and

- Defendant's unjust enrichment through the exploitation and monetization of Plaintiffs' and Class Members' Private Information.

338. These injuries were the foreseeable and natural consequence of Defendant's failure to exercise reasonable care in safeguarding Plaintiffs' and Class Members' Private Information and communications.

339. Critically, Defendant's conduct was uniform as to Plaintiffs and Class Members: Defendant implemented the same or substantially similar Tracking Technologies across its Website, resulting in the systematic and contemporaneous disclosure of communications and Private Information to the same categories of third parties. Accordingly, Plaintiffs' and Class Members' injuries arise from a common course of conduct and can be proven through common evidence, including Defendant's configurations, vendor integrations, and data flows.

340. As a result of Defendant's negligent conduct, Plaintiffs and Class Members seek all damages available under Illinois law, including:

- Compensatory damages in an amount to be determined at trial, including damages for loss of privacy, loss of the value of their Private Information, and loss of the benefit of their bargain;

- General damages for the invasion of their privacy rights and the unauthorized disclosure of confidential medical information, which are capable of classwide measurement based on Defendant's uniform conduct;

- Damages for time, effort, and expenses incurred in mitigating the effects of Defendant's conduct;

- Restitution and disgorgement of all revenues, profits, and other benefits Defendant obtained as a result of its unlawful conduct, which can be calculated on a classwide basis;

- Statutory or nominal damages, as appropriate, for each violation; and

- All other relief the Court deems just and proper.

## COUNT VIII
### VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631
*(On behalf of Plaintiffs & the California Subclass)*

341. Plaintiffs, on behalf of themselves and the California Subclass, repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

342. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

343. CIPA begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

> California Penal Code § 631(a) provides, in pertinent part: Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within their state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in their section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)[.]

Cal. Penal Code § 631.

344. A defendant must show it had the consent of *all* parties to a communication.

345. At all relevant times, Defendant aided, employed, agreed with, and conspired with Adobe and potentially other third parties to track and intercept Plaintiffs' and California Subclass Members' internet communications while using the Website, specifically by installing and configuring the Tracking Technology to permit Adobe to eavesdrop on and intercept in real-time

68

CLASS ACTION COMPLAINT

the content of Plaintiffs' and California Subclass Members' private communications with Defendant.

346. The content of those conversations included Private Information, such as highly sensitive PHI. Through Defendant's installation and configuration of the Tracking Technology on its Website, these communications were intercepted by Adobe during the communications and without the knowledge, authorization, or consent of Plaintiffs and California Subclass Members.

347. Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiffs and California Subclass Members, transmitted the substance of their confidential communications with Defendants to a third party.

348. Defendant willingly facilitated Adobe's and potentially other third parties' interception and collection of Plaintiffs' and California Subclass Members' private medical information by embedding the Tracking Technology on the Website, thereby assisting Adobe's eavesdropping.

349. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Technology falls under the broad catch-all category of "any other manner":

    a. The computer codes and programs Adobe and potentially other third parties used to track Plaintiffs' and California Subclass Members' communications while they were navigating the Website;

    b. Plaintiffs' and California Subclass Members' browsers;

    c. Plaintiffs' and California Subclass Members' computing and mobile devices;

    d. Adobe's web and ad servers;

    e. The web and ad servers from which Adobe and potentially other third parties tracked and intercepted Plaintiffs' and California Subclass Members' communications while they were using a web browser to access or navigate the Website; and

    f. The plan Adobe and other third parties carried out to effectuate its tracking and interception of Plaintiffs' and California Subclass Members' communications while they were using a web browser or mobile application to visit the Website.

CLASS ACTION COMPLAINT

350. Defendant failed to disclose that it uses the Tracking Technology to track and automatically and simultaneously transmit highly sensitive personal communications to a third party. Defendant is necessarily aware that these communications are confidential as their Website privacy notices acknowledge the confidential nature of PHI and disclaims that it is being shared with unidentified third parties without Plaintiffs' and California Subclass Members' express authorization.

351. The patient communication information that Defendant transmits while using the Tracking Technology constitutes protected health information.

352. As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties, including Adobe and its agents, employees, and contractors to receive its patients' online communications in real time through its Website without their consent. Adobe specifically receives the content of these communications and understands it, as the MID, ECID, TDID are assigned by Adobe and Adobe must understand the content in order to process it and link it to individual Users so that Adobe and potentially other third parties may target advertising to those persons based on their healthcare choices.

353. By disclosing Plaintiffs' and the California Subclass Members' private health information, Defendant violated Plaintiffs' and California Subclass Members' statutorily protected right to privacy.

354. As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiffs and California Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to their section that the Plaintiffs have suffered, or be threatened with, actual damages."

355. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

CLASS ACTION COMPLAINT

## COUNT IX
### VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
#### Cal. Penal Code § 632
*(On behalf of Plaintiffs & the California Subclass)*

356. Plaintiffs, on behalf of themselves and the California Subclass, repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

357. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

358. California Penal Code § 632(a) provides, in pertinent part:

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation[.]

359. California Penal Code § 632(c) defines a "confidential communication" as:

> Any communication carried on in circumstances as may reasonably indicate that any party to the communications desires to be confined to the parties thereto, but excludes a communication made … in any other circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.

360. Courts routinely hold that internet communications can have sufficient confidential character to support a section 632 claim.

361. At all relevant times, Defendant aided, employed, agreed with, and conspired with Adobe and potentially other third parties to record and eavesdrop upon Plaintiffs' and California Subclass Members' confidential communications while using the Website, specifically by installing and configuring the Tracking Technology to permit Adobe to eavesdrop upon and record the content of Plaintiffs' and California Subclass Members' confidential communications with Defendant.

362. The content of those conversations included Private Information, such as highly sensitive PHI. Through Defendant's installation and configuration of the Tracking Technology on its Website, these communications were intercepted by Adobe during the communications and

71
CLASS ACTION COMPLAINT

without the knowledge, authorization, or consent of Plaintiffs and California Subclass Members.

363.  Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiffs and California Subclass Members, recorded and transmitted the substance of their confidential communications with Defendants to a third party.

364.  Defendant willingly facilitated Adobe's and potentially other third parties' interception and collection of Plaintiffs' and California Subclass Members' private health information by embedding the Tracking Technology on the Website, thereby assisting Adobe's and potentially other third parties' eavesdropping.

365.  Plaintiffs and California Subclass Members did not know of, and did not consent to, any recording or eavesdropping of these confidential communications.

366.  The following items constitute "electronic amplifying or recording device to eavesdrop upon or record the confidential communication" under the CIPA:

    a.  The computer codes and programs Adobe and potentially other third parties used to track Plaintiffs' and California Subclass Members' communications while they were navigating the Website;

    b.  Plaintiffs' and California Subclass Members' browsers;

    c.  Plaintiffs' and California Subclass Members' computing and mobile devices;

    d.  Adobe's web and ad servers;

    e.  The web and ad servers from which Adobe and potentially other third parties tracked and intercepted Plaintiffs' and California Subclass Members' communications while they were using a web browser to access or navigate the Website;

    f.  The computer codes and programs used by Adobe and potentially other third parties to effectuate its tracking and interception of Plaintiffs' and California Subclass Members' communications while they were using a browser to visit the Website; and

    g.  The plan Adobe and potentially other third parties carried out to effectuate its tracking and interception of Plaintiffs' and California Subclass Members' communications while they were using a web browser or mobile application to visit the Website.

367.  Defendant failed to disclose that its uses the Tracking Technology to track and

CLASS ACTION COMPLAINT

automatically and simultaneously transmit highly sensitive personal communications to a third party. Defendant is necessarily aware that these communications are confidential as its Website privacy policy acknowledges the confidential nature of PHI and disclaims that it is being shared with unidentified third parties without Plaintiffs' and California Subclass Members' express authorization.

368. The patient communication information that Defendant transmits while using the Tracking Technology constitutes protected health information.

369. As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties, including Adobe and its agents, employees, and contractors to receive its patients' online communications through its Website without their consent. Adobe specifically receives the content of these communications and understands it, as the MID, ECID, and TDID are assigned by Adobe and Adobe must understand the content in order to process it and link it to individual Users so that Adobe may target advertising to those persons based on their healthcare choices.

370. By disclosing Plaintiffs' and the California Subclass Members' private health information, Defendant violated Plaintiffs' and California Subclass Members' statutorily protected right to privacy.

371. The data collected by Defendant constituted "confidential communications" as that term is used in section 632, because California Plaintiffs and California Subclass Members had objectively reasonable expectations of privacy in their devices and activity when communicating Sensitive Health Information to Defendant.

372. As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiffs and California Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to their section that the Plaintiffs have suffered, or be threatened with, actual damages."

373. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

CLASS ACTION COMPLAINT

## COUNT X
### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code §§ 638.50–638.51
*(On Behalf of Plaintiffs and the California Subclass)*

374. Plaintiffs, on behalf of themselves and the California Subclass, incorporate by reference all preceding paragraphs as though fully set forth herein.

375. Cal. Penal Code § 638.50 prohibits any person or entity from knowingly installing or using a pen register or trap and trace device without first obtaining a court order or authorization as required by law.

376. Cal. Penal Code § 638.51 further prohibits any person or entity from installing or using a pen register or trap and trace device without the consent of the user of the service.

377. A "pen register" is defined under California law as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted.

378. A "trap and trace device" is defined as a device or process that captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication.

379. At all relevant times, Plaintiffs and members of the Class used Defendant's Website to send and receive electronic communications over the internet while in California.

380. These communications included, among other things, requests to load webpages relating to vaccines and immunization services; interactions with Defendant's vaccine scheduling interfaces; selections of vaccine types, locations, and appointment times; form inputs and navigation steps reflecting healthcare-related decisions; and HTTP requests and responses exchanged between Plaintiffs' browser or device and Defendant's servers.

381. Defendant knowingly installed, deployed, and operated Tracking Technologies—including, but not limited to, Adobe Analytics and related Adobe Experience Cloud tools—that functioned as pen registers and trap and trace devices.

382. These technologies were embedded within Defendant's Website and executed in Plaintiffs' browser or device at the time Plaintiffs interacted with vaccine-related webpages and

74

CLASS ACTION COMPLAINT

scheduling tools.

383. Defendant's Adobe Tracking Technologies captured and recorded dialing, routing, addressing, and signaling information associated with Plaintiffs' electronic communications.

384. Their information included, without limitation, full or partial URLs reflecting vaccine-related webpages and scheduling steps; query string parameters and path information indicating user interactions and selections; page names, event identifiers, and interaction signals transmitted to Adobe endpoints; device, browser, and session identifiers used to associate communications with a particular user or device; and network-level request data reflecting how, when, and from where communications were transmitted.

385. These data points constitute routing, addressing, and signaling information because they identify the destination, structure, timing, and nature of Plaintiffs' communications with Defendant's systems.

386. Defendant's Adobe tracking technologies captured their information contemporaneously with Plaintiffs' communications, including at the moment Plaintiffs accessed vaccine-related pages and interacted with scheduling functionality.

387. These technologies operated automatically and in real time, without requiring any action by Plaintiffs beyond engaging with Defendant's Website.

388. By capturing outgoing request information—such as URLs, parameters, and interaction signals—Defendant used processes that functioned as pen registers within the meaning of Cal. Penal Code § 638.50.

389. By capturing incoming and outgoing communication data sufficient to identify the source and destination of communications, Defendant also used processes that functioned as trap and trace devices within the meaning of Cal. Penal Code § 638.51.

390. These processes enabled Defendant and its third-party partner, Adobe, to monitor and record the routing, addressing, and signaling information associated with Plaintiffs' electronic communications.

391. Defendant installed and used these devices and processes without obtaining a court order or other lawful authorization.

CLASS ACTION COMPLAINT

392. Defendant also installed and used these devices and processes without the consent of Plaintiffs and members of the Class.

393. Plaintiffs and members of the Class were not informed that their vaccine-related interactions—including communications reflecting their intent to obtain medical treatment—would be transmitted to and recorded by Adobe.

394. Any purported consent obtained by Defendant was not informed, explicit, or meaningful, and therefore does not satisfy the requirements of Cal. Penal Code §§ 638.50–638.51.

395. The communications at issue included sensitive healthcare-related interactions, including Plaintiffs' efforts to research and schedule vaccinations.

396. The routing, addressing, and signaling information captured by Defendant therefore revealed highly sensitive information about Plaintiffs' medical interests and treatment-seeking behavior.

397. Plaintiffs and members of the Class had a reasonable expectation that such information would not be captured, monitored, or transmitted to third parties such as Adobe.

398. Defendant knowingly enabled and facilitated Adobe's collection and processing of their information by embedding Adobe tracking technologies within its Website.

399. Through these integrations, Defendant caused Plaintiffs' communications and associated signaling information to be transmitted to Adobe in real time.

400. Defendant's conduct constitutes an egregious invasion of privacy and a violation of California law.

401. As a direct and proximate result of Defendant's violations of Cal. Penal Code §§ 638.50–638.51, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

402. Pursuant to Cal. Penal Code § 637.2 and other applicable provisions, Plaintiffs and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

76
CLASS ACTION COMPLAINT

## COUNT XI
### VIOLATIONS OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT ("CDAFA")
### Cal. Penal Code § 502, *et seq.*
### *(On behalf of Plaintiffs & the California Subclass)*

403.   Plaintiffs, on behalf of themselves and the California Subclass, repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

404.   Cal. Penal Code Section 502 provides: "For purposes of bringing a civil or criminal action under their section, a person who causes, by any means, the access of a computer, computer system or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

405.   Plaintiffs and California Subclass Members' devices on which they accessed Walgreens' Website, including computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. *Id.* § 502(b)(5).

406.   Walgreens violated Cal. Penal Code section 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiffs' and California Subclass Members' data as described herein.

407.   In violation of Cal. Penal Code section 502(c)(2), Walgreens specifically accessed Plaintiffs and California Subclass Members' Private Information that was provided to Defendant for the purpose of the provision of medical care, but Defendant used and transmitted the data in excess of its permission by providing the data to Adobe and potentially other third parties through the use of the Tracking Technology for marketing and analytics purposes.

408.   Walgreens also violated Cal. Penal Code section 502(c)(7) by knowingly and without permission accessing or causing to be accessed Plaintiffs' and California Subclass Members' data as described herein.

409.   In violation of Cal. Penal Code section 502(c)(7), Walgreens specifically caused Tracking Technology from a third party to cause the access of Plaintiffs' and California Subclass Members' data beyond the scope of permission provided to Walgreens for the provision of medical care.

410.   Walgreens was unjustly enriched by acquiring the valuable Private Information of

CLASS ACTION COMPLAINT

Plaintiffs and California Subclass Members without permission and using it for Walgreens' own financial benefit to advance its business interests.

411. Plaintiffs and California Subclass Members retain a stake in the profits that Walgreens earned from the misuse of their activity and Private Information because, under the circumstances, it is unjust for Walgreens to retain those profits.

412. Walgreens violated the CDAFA from Plaintiffs and California Subclass Members' devices in and from the State of California, where Walgreens marketed and sold its products and services. Accordingly, Walgreens caused the access of their devices in California and is therefore deemed to have accessed their devices in California.

413. As a direct and proximate result of Walgreens' unlawful conduct within the meaning of Cal. Penal Code section 502, Walgreens has caused loss to Plaintiffs and California Subclass Members and has been unjustly enriched in an amount to be proven at trial.

414. Plaintiffs and California Subclass Members are entitled to punitive and exemplary damages pursuant to Cal. Penal Code section 502(e)(4) because Walgreens' violations were willful and, upon information and belief, Walgreens is guilty of oppression or malice as defined by Cal. Civil Code section 3294.

415. Plaintiffs and California Subclass Members are also entitled to recover their reasonable attorney's fees pursuant to Cal. Penal Code section 502(e).

**COUNT XII**
**VIOLATIONS OF THE CALIFORNIA CONFIDENTIALITY OF**
**MEDICAL INFORMATION ACT**
**Cal. Civ. Code §§ 56, *et seq.***
***(On behalf of Plaintiffs & the California Subclass)***

416. Plaintiffs, on behalf of themselves and the California Subclass, repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

417. The California Confidentiality of Medical Information Act, California Civil Code §§ 56, et seq. ("CMIA") prohibits health care providers from disclosing medical information relating to their patients without patient authorization. "Medical information" refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment.

78
CLASS ACTION COMPLAINT

'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual[.]" CAL. CIV. CODE § 56.05.

418. Defendant is a "provider of health care" as defined by California Civil Code § 56.06(b).

419. Plaintiffs and California Subclass Members are patients, and, as health care providers, Defendant had an ongoing obligation to comply with the CMIA's requirements. As set forth above, device identifiers, web URLs, and other characteristics that can uniquely identify Plaintiffs and California Subclass Members are transmitted from within the State of California to Defendants in combination with vaccinations sought by the patients. There is protected health information under the CMIA.

420. Their private medical information is intercepted and transmitted within the State of California to third parties including Adobe and its agents, employees, and contactors via Defendant's knowing and intentional decision to embed enabling software into its Website.

421. Adobe's ECID, NID, and TDID are also identifiers sufficient to allow identification of an individual. Along with these identifiers, Defendant discloses to third parties including Adobe and its agents, employees, and contactors several pieces of information regarding patient use of its Website including, but not limited to, the vaccination selected by the patients.

422. The information described above constitutes medical information pursuant to the CMIA because it is patient information derived from a provider of health care regarding patients' medical treatment and physical condition, and their medical information is linked with individually identifying information. CAL. CIV. CODE § 56.05(i).

423. As demonstrated hereinabove, Defendant failed to obtain its patients' authorization for the disclosure of medical information and fails to disclose in their Website Privacy Notice that it shares protected health information with Adobe or other third parties for marketing purposes.

424. Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must be: (1) "Clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2)

CLASS ACTION COMPLAINT

signed and dated by the patient or their representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Accordingly, the information set forth in Defendant's Website Privacy Notice does not qualify as a valid authorization.

425. As described above, Defendant is violating the CMIA by disclosing its patients' medical information to third parties, including Adobe and its agents, employees, and contractors along with the patients' individually identifying information. Accordingly, Plaintiffs and California Subclass Members seek all relief available for Defendant's CMIA violations.

426. Plaintiffs and California Subclass Members seek statutory damages, compensatory damages, punitive damages, attorney fees, and costs of litigation for Defendant's violation(s) of the CMIA.

### COUNT XIII
### UNJUST ENRICHMENT
### *(On behalf of Plaintiffs & the California Subclass)*

427. Plaintiffs, on behalf of themselves and the California Subclass, repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

428. This claim is brought under California law and pleaded in the alternative to Plaintiffs' other claims.

429. Defendant obtained money, property, and other benefits from Plaintiffs and California Subclass Members through its collection, use, and disclosure of their Private Information via the Tracking Technologies described herein.

430. Plaintiffs and California Subclass Members conferred a benefit on Defendant by providing their Private Information in connection with obtaining healthcare services, including scheduling vaccinations, with the reasonable expectation that such information would be used solely for healthcare purposes and kept confidential.

431. Defendant knowingly and wrongfully exceeded the scope of that authorization by transmitting, using, and monetizing Plaintiffs' and California Subclass Members' Private Information for analytics, advertising, and other commercial purposes unrelated to the provision of healthcare.

CLASS ACTION COMPLAINT

432. Through this conduct, Defendant derived economic and other benefits, including by enhancing its marketing capabilities, improving user profiling, and obtaining value from third-party relationships and services tied to the use of Plaintiffs' and California Subclass Members' data.

433. Plaintiffs and California Subclass Members did not consent to these uses and did not provide their Private Information for Defendant's commercial exploitation. The benefits conferred were therefore not gratuitous.

434. Defendant's retention of these benefits is unjust because they were obtained through wrongful conduct, including the unauthorized interception and disclosure of Plaintiffs' and California Subclass Members' Private Information.

435. As a direct and proximate result of Defendant's conduct, Defendant has been unjustly enriched at the expense of Plaintiffs and California Subclass Members.

436. Plaintiffs and California Subclass Members seek restitution and disgorgement of all benefits Defendant unjustly obtained, including all revenues, profits, and other value derived from the collection, use, and disclosure of their Private Information.

437. It would be inequitable and contrary to good conscience for Defendant to retain these benefits. Plaintiffs and California Subclass Members are therefore entitled to restitutionary relief and all other appropriate equitable remedies.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiffs and Counsel to represent such Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in their Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

CLASS ACTION COMPLAINT

D.    For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as their Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that their matter be tried before a jury.

DATE: April 7, 2026                    Respectfully Submitted,

ALMEIDA LAW GROUP LLC

*/s/ Matthew J. Langley*
Matthew J. Langley (SBN 342286)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 312-576-3024
matt@almeidalawgroup.com

Andrew R. Tate (*pro hac vice* forthcoming)
**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
(314) 669-3600
atate@peifferwolf.com

Wail Jihadi (*pro hac vice* forthcoming)
**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**
1701 Pennsylvania Avenue N.W., Suite 200
Washington, DC 20006
(314) 669-3600
wjihadi@peifferwolf.com

*Attorneys for Plaintiffs & the Proposed Class*

CLASS ACTION COMPLAINT