Matthew J. Langley (SBN 342846)
matt@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 773-554-9354

Andrew R. Tate (*pro hac vice* granted)
atate@peifferwolf.com
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE LLP**
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
(314) 669-3600

*Attorneys for Plaintiffs & the Proposed Class*

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| N.G., R.L., R.S., and I.P., *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>vs.<br><br>WALGREEN CO.,<br><br>Defendant. | Case No. 3:26-cv-02994-RS<br><br>Assigned to: Hon. Richard Seeborg<br><br>**RESPONSE IN OPPOSITION TO DEFENDANT WALGREEN CO.'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br>Date: October 1, 2026<br>Time: 1:30 p.m.<br>Location: Courtroom 12, 19th Floor<br><br><u>CLASS ACTION</u> |

## TABLE OF CONTENTS


INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 3

A. Plaintiffs' claims ..... 3

B. The vaccine-scheduling screen Walgreens attributes to R.L. and I.P. ..... 3

C. The 2024 Terms Walgreens invokes against R.L. and I.P. ..... 5

D. The account-creation records for N.G. and R.S. and the 2018/2021 Terms ..... 5

LEGAL STANDARD ..... 7

ARGUMENT ..... 7

I. The Court, not an arbitrator, decides whether any agreement was formed. ..... 7

II. Walgreens has not proven that R.L. or I.P. agreed to arbitrate. ..... 7

A. Walgreens did not provide reasonably conspicuous notice of the terms containing the arbitration clause. ..... 8

B. Checking the box did not unambiguously manifest assent. ..... 11

C. The decisions Walgreens relies on expressly communicated every contractual consequence attached to the user's act. ..... 14

D. Walgreens has not established that R.L. or I.P. formed an arbitration agreement, and the making of any agreement is therefore an issue of fact. ..... 15

E. The 2024 Terms' delegation clause and arbitration scheme are unconscionable. ..... 15

III. The 2018 and 2021 Terms invoked against N.G. and R.S. are unenforceable. ..... 17

A. Walgreens has not carried its formation burden as to N.G. ..... 17

B. Nothing in the 2018/2021 Terms clearly and unmistakably delegates arbitrability. ..... 18

C. The arbitration agreement is permeated by unconscionability. ..... 22

1. Procedural unconscionability. ..... 22

2. Substantive unconscionability. ..... 23

3. Permeation. ..... 24

IV. No stay is warranted, and any stay should be limited to compelled claims. ..... 24

CONCLUSION ..... 25

**TABLE OF AUTHORITIES**


Cases Page(s)

*Aanderud v. Superior Court*,
13 Cal. App. 5th 880 (2017) .... 21

*Ahlstrom v. DHI Mortgage Co.*,
21 F.4th 631 (9th Cir. 2021) .... 7

*Armendariz v. Foundation Health Psychcare Services, Inc.*,
24 Cal. 4th 83 (2000) .... *passim*

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) .... 22

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .... *passim*

*Bielski v. Coinbase, Inc.*,
87 F.4th 1003 (9th Cir. 2023) .... 16, 20, 21

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) .... 18, 19

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) .... *passim*

*Circuit City Stores v. Ahmed*,
283 F.3d 1198 (9th Cir. 2002) .... 22

*Cordas v. Uber Technologies, Inc.*,
228 F. Supp. 3d 985 (N.D. Cal. 2017) .... 20, 21

*Dickey v. Ticketmaster LLC*,
2019 WL 9096443 (C.D. Cal. Mar. 12, 2019) .... 14

*Douglas v. U.S. Dist. Court*,
495 F.3d 1062 (9th Cir. 2007) .... 24

*Eiess v. USAA Fed. Sav. Bank*,
404 F. Supp. 3d 1252 (N.D. Cal. 2019) .... 19, 20

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) .... 18, 19

*Fisher v. MoneyGram Int'l, Inc.*,
66 Cal. App. 5th 1084 (2021) .... 23

*Gentry v. Superior Court*,
42 Cal. 4th 443 (2007) .... 22

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) .... 18

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) .... *passim*

*Graf v. Match.com, LLC*,
2015 WL 4263957 (C.D. Cal. July 10, 2015) .... 14

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010) .... 7

*Hansen v. LMB Mortg. Servs., Inc.*,
1 F.4th 667 (9th Cir. 2021) .... 7, 15

*Heckman v. Live Nation Entertainment, Inc.*,
120 F.4th 670 (9th Cir. 2024) ........ *passim*
*Herzog v. Superior Court*,
101 Cal. App. 5th 1280 (2024) ........ 12, 13
*Hooper v.Jerry Insurance Agency, LLC*,
675 F. Supp. 3d 1027 (N.D. Cal. 2023) ........ 14, 20
*In re BAM Trading Servs. Inc. Sec. Lit.*,
733 F. Supp. 3d 854 (N.D. Cal. 2024) ........ 19
*Ingalls v. Spotify USA, Inc.*,
2016 WL 6679561 (N.D. Cal. Nov. 14, 2016) ........ 19
*Kahl v. Plentyoffish Media ULC*,
2023 U.S. Dist. LEXIS 103055 (N.D. Cal. June 13, 2023) ........ 21
*Kaplan v. Athletic Media Co.*,
705 F. Supp. 3d 992 (N.D. Cal. 2023) ........ 20
*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) ........ 7
*Knutson v. Sirius XM Radio Inc.*,
771 F.3d 559 (9th Cir. 2014) ........ 7, 15
*Landis v. N. Am. Co.*,
299 U.S. 248 (1936) ........ 25
*Leyva v. Certified Grocers of Cal., Ltd.*,
593 F.2d 857 (9th Cir. 1979) ........ 25
*MacClelland v. Cellco P'ship*,
609 F. Supp. 3d 1024 (N.D. Cal. 2022) ........ 17, 19, 23, 24
*Meadows v. Dickey's Barbecue Rests., Inc.*,
144 F. Supp. 3d 1069 (N.D. Cal. 2015) ........ 20
*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ........ 25
*Namisnak v. Uber Techs., Inc.*,
315 F. Supp. 3d 1124 (N.D. Cal. 2018) ........ 18
*Nedlloyd Lines B.V. v. Superior Court*,
3 Cal. 4th 459 (1992) ........ 24
*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ........ 12
*Norcia v. Samsung Telecomms. Am., LLC*,
845 F.3d 1279 (9th Cir. 2017) ........ 7
*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ........ 7, 10, 14
*Oracle Am., Inc. v. Myriad Grp. A.G.*,
724 F.3d 1069 (9th Cir. 2013) ........ 18
*OTO, L.L.C. v. Kho*,
8 Cal. 5th 111 (2019) ........ 16, 22
*Patrick v. Running Warehouse, LLC*,
93 F.4th 468 (9th Cir. 2024) ........ 19, 20
*Pinela v. Neiman Marcus Group, Inc.*,
238 Cal. App. 4th 227 (2015) ........ 21, 22, 24

*Ramirez v. Charter Communications, Inc.*,
16 Cal. 5th 478 (2024) .......... 17, 24
*Rent-A-Center v. Jackson*,
requires. 561 U.S. 63 (2010) .......... 15, 21
*Rodriguez v. American Technologies, Inc.,*,
136 Cal. App. 4th 1110 (2006) .......... 21
*Ronderos v. USF Reddaway, Inc.*,
114 F.4th 1080 (9th Cir. 2024) .......... 23, 24
*Sandler v. Modernizing Medicine, Inc.,*
170 F.4th 1209 (9th Cir. 2026) .......... 20
*Scribner v. Trans Union LLC*,
738 F. Supp. 3d 1301 (E.D. Cal. 2024) .......... 15
*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) .......... 9
*Smith v. Spizzirri*,
601 U.S. 472 (2024) .......... 24
*Ting v. AT&T*,
319 F.3d 1126 (9th Cir. 2003) .......... 22
*Tiri v. Lucky Chances, Inc.*,
226 Cal. App. 4th 231 (2014) .......... 21
*Trout v. Comcast Cable Communications, LLC*,
2018 WL 4638705 (N.D. Cal. Mar. 15, 2018) .......... 22
*Villalobos v. Maersk, Inc.*,
114 Cal. App. 5th 1170 (2025) .......... 21
*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
489 U.S. 468 (1989) .......... 7
*Wherry v. Award, Inc.*,
192 Cal. App. 4th 1242 (2011) .......... 23
*White v. PayPal Holdings Inc.*,
821 F. Supp. 3d 1058 (N.D. Cal. 2026) .......... 15
*Wray v. Humble Bundle, Inc.*,
824 F. Supp. 3d 868 (N.D. Cal. 2025) .......... 19

Statutes

9 U.S.C. § 4 .......... 7, 15, 25
18 U.S.C. § 2520(e) .......... 23
Cal. Civ. Code § 56.36(b) .......... 23
Cal. Civ. Code § 1580 .......... 13
Cal. Civ. Code § 1668 .......... 23
Cal. Civ. Code § 3513 .......... 24
Cal. Civ. Proc. Code § 335.1 .......... 23
Cal. Civ. Proc. Code § 338(a) .......... 23
Cal. Penal Code § 502(e)(5) .......... 3, 23
Cal. Penal Code § 637.2 .......... 23
Fed. R. Evid. 602 .......... 15, 18
Fed. R. Evid. 901(a) .......... 15

## INTRODUCTION

Patients scheduling a vaccination on Walgreens' website are guided through the steps necessary to complete that one-time healthcare appointment. They provide the information needed to schedule the vaccination, review the disclosures accompanying their care, and decide how Walgreens will communicate with them about the appointment. Nothing during that process suggests they are entering a contractual relationship with Walgreens or that they should be looking for contractual terms governing future legal disputes.

Just before completing the appointment, patients encounter a checkbox accompanied by a disclosure requesting consent to receive appointment-related text messages. From beginning to end, the disclosure accompanying this checkbox concerns those SMS text communications. It explains appointment confirmations, reminder notices, cancellation messages, mobile carrier charges, and how patients may stop future messages. A reasonably prudent internet user would understand the checkbox to request consent for those communications. Only in the disclosure's final sentence does Walgreens reference its Terms of Use and Privacy Policy. However, if the reference to the Terms buried at the end of this paragraph is noticed at all, the surrounding context naturally suggests those Terms relate to the text-message program the disclosure has been describing, not to a mandatory arbitration provision governing every dispute the patient might later have with Walgreens.

Moreover, immediately below the checkbox, the page displays vaccination conditions and privacy disclosures concerning the patient's protected health information. Those visible provisions reasonably appear to be the terms governing the appointment, further obscuring that the hyperlink leads to a separate agreement containing an arbitration provision. Further, the disclosure accompanying the checkbox explicitly states that "consent is not a condition for purchasing the services." *See* ECF No. 19-2, Exhibit A to the Declaration of Vishal Parekh. The design also gives patients no way to accept one purported agreement while declining the other. Walgreens treats the same checkbox as obtaining consent for two distinct legal purposes, even though the disclosure expressly defines the act as consent to receive appointment-related text messages. Viewed as a whole, the page does not provide reasonably conspicuous notice that checking the checkbox also manifests assent to a separate agreement containing a mandatory arbitration provision.

Walgreens relies on the vaccination scheduling webpage to establish an agreement to arbitrate with R.L. and I.P. However, the webpage did not provide reasonably conspicuous notice that the checkbox manifested assent to contractual terms containing that agreement, and the same act could reasonably be understood as consent to receive text messages, acceptance of the visible on-page disclosures, or both. Walgreens also identifies no record showing that either Plaintiff encountered the archived webpage, checked the box, or completed the scheduling process through that interface. It therefore cannot establish either reasonably conspicuous notice or the unambiguous manifestation of assent necessary to compel arbitration. *See Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 857–858 (9th Cir. 2022) (affirming denial of motion to compel, holding that website did not provide conspicuous notice because it did not "clearly denote the hyperlink" and finding that plaintiffs did not manifest assent, explaining that "notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement").

For N.G. and R.S., Walgreens relies on years-old account-creation Terms. It provides no image of the 2018 interface N.G. allegedly encountered, and the screenshot offered for R.S. predates both his account creation and the effective date of the Terms Walgreens says he accepted. Walgreens relies on a bare incorporation of arbitral rules to prevent this Court from finding any of its Terms unenforceable, but that maneuver does not clearly and unmistakably delegate arbitrability of ordinary consumer transactions on this record. Even if Walgreens could establish agreement formation, the arbitration provisions it seeks to enforce remain procedurally and substantively unconscionable. The 2024 Terms invoked against R.L. and I.P. bar most coordinated claimants from filing in any forum while selected bellwethers and mandatory mediation funnel surviving claims to Illinois. This arbitration structure closely resembles the mass-arbitration regime held unconscionable in *Heckman v. Live Nation Entertainment, Inc.*, 120 F.4th 670, 683–89 (9th Cir. 2024). The earlier Terms invoked against N.G. and R.S. impose a zero-dollar liability cap, a one-year claims bar, a one-way indemnity provision, and an Illinois choice-of-law clause that would eliminate the California claims Walgreens seeks to arbitrate.

The motion should be denied.

## STATEMENT OF FACTS

### A. Plaintiffs' claims

Plaintiffs are four California residents who used Walgreen Co.'s ("Walgreens") website in connection with scheduling vaccinations. ECF No. 18, Amended Complaint ("Compl.") ¶¶ 17–20. Plaintiffs allege that Walgreens embedded Adobe tracking technologies in its vaccine-scheduling pages that transmitted their protected health information to Adobe in real time. *Id*. ¶¶ 1–14, 174–206. That information included their patient status, the fact that they were making a vaccine appointment, and the specific vaccine they were scheduling, together with persistent identifiers linking the information to their real-world identities, all without their knowledge or consent. *Id*. Plaintiffs assert thirteen claims, including violations of the federal Wiretap Act, the California Invasion of Privacy Act, the Confidentiality of Medical Information Act, Penal Code § 502, and the California Constitution. Compl. ¶¶ 228–437.

### B. The vaccine-scheduling screen Walgreens attributes to R.L. and I.P.

Walgreens contends that R.L. and I.P. formed arbitration agreements when they scheduled vaccine appointments in September 2024. Mot. at 1, 8. Its sole evidence of what that screen allegedly displayed is Exhibit A to the declaration of Vishal Parekh.[1]

The captured page is a scheduling form. It opens under a retail promotion ("Extra 15% off $35+ sitewide* with code AUG15") and a COVID-19 vaccine advisory, followed by fields for location, date of birth, email, and phone number. Parekh Decl., Ex. A at 2–3. Below the phone field appears a checkbox accompanied by a nine-line paragraph in small type. Eight of its nine lines concern automated text messages. Parekh Decl., Ex. A at 3. The phrases "Terms of Use" and "Privacy Policy" in the final sentence are hyperlinks. *Id.* A "Next" button follows below the checkbox. *Id.* Two additional blocks of text appear directly beneath the "Next" button in the same small type. They set conditions on the vaccination service and address the disclosure of the patient's protected health information.

[1] This exhibit is a printout, generated May 28, 2026, of an archive.org capture of www.walgreens.com/findcare/schedule-vaccine dated September 1, 2024, rendered on a desktop browser. ECF No. 19-1, Declaration of Vishal Parekh ("Parekh Decl.") ¶ 7 & n.1, Ex. A.



*Phone

By checking this box, I agree to receive automated text messages to the mobile phone number listed above from Walgreens about both this appointment (including failure to complete the appointment, confirmation, cancellation, and reminder notices) and any previously scheduled appointments for which I have consented to receive SMS text messages. I'm aware that mobile messages and data rates may apply, and that my consent is not a condition for purchasing the services. Reply STOP to opt-out. I also agree to the Walgreens Terms of Use and Privacy Policy.

Next

Walgreens Pharmacy administers applicable vaccinations for children ages three and older. State and age restrictions may apply. Vaccines are subject to availability; certain vaccines may not be available in all stores.

1 We may contact the patient if they are unable to complete the appointment, or to notify them of any updates or changes to the appointment. Standard email is not a secure means of communication. The patient's protected health information that may be contained in our emails to them will not be encrypted. This means there is a risk the patient's protected health information in the emails could be intercepted and read by, or disclosed to, unauthorized third parties. By entering the patient's email and selecting "Next", the patient agrees to accept the risks associated with non-secure, unencrypted email communications from us containing their protected health information.

**Figure 1: The checkbox disclosure and the vaccination and privacy disclosures beneath it (Parekh Decl., Ex. A).**

R.L. scheduled vaccination appointments through walgreens.com in September 2024 using a phone browser or laptop computer. *See* Declaration of R.L. ("R.L. Decl.") ¶¶ 4–5. She recalls the scheduling form and checkbox and understood the checkbox to request consent to receive appointment-related text messages, not to sign a contract, agree to arbitration, or surrender legal rights. *See id.* ¶¶ 6–7. I.P. scheduled a travel vaccination in September 2024 using a phone browser and did not understand herself to be entering a contract with Walgreens. *See* Declaration of I.P. ("I.P. Decl.") ¶¶ 4–6. Neither recalls clicking, opening, or reading any hyperlink labeled "Terms of Use" or "Privacy

Policy." R.L. Decl. ¶¶ 8–9; I.P. Decl. ¶¶ 7–8. Neither recalls being shown a multi-page terms document and before this lawsuit neither knew of any claimed agreement or arbitration provision. *Id*. Walgreens submits no record evidence that R.L. or I.P. checked the box. *See generally* Parekh Decl.

**C. The 2024 Terms Walgreens invokes against R.L. and I.P.**

The Terms Walgreens attributes to R.L. and I.P., effective May 21, 2024, restrict how coordinated claims may be filed and resolved. Specifically, whenever 20 or more similar notices of dispute involve "the same or coordinated counsel," "claimants are aggregated." *See* Parekh Decl. Ex. B at 5–7. Thereafter, "only" party-selected bellwether cases "may be filed with the arbitration provider" while all other claims are suspended pending bellwether arbitrations and a mandatory global mediation. *Id*. Unresolved claims may then be filed only in state court in Cook County, Illinois, or the Northern District of Illinois and "[a] court shall have authority to enforce this bellwether process and may enjoin the filing of lawsuits or arbitration demands not made in compliance with it." *Id*.

**D. The account-creation records for N.G. and R.S. and the 2018/2021 Terms**

Walgreens states that R.S. created an account on February 24, 2021. Parekh Decl. ¶ 9. Walgreens provides an archive.org capture dated January 26, 2021, one month before his account creation and before the February 18, 2021 effective date of the Terms Walgreens says he accepted.[2] R.S. does not recall the specific sign-up screen, any checkbox, or any reference to "Terms of Use," and he never clicked, opened, or read Walgreens' Terms of Use. Declaration of R.S. ("R.S. Decl.") ¶¶ 4–6. A retired special-education teacher with no legal training, R.S. transacted as an ordinary retail consumer, had never heard of the American Arbitration Association, has never seen any AAA rules, and did not understand that a reference to such rules in a company's terms could determine whether a court or an arbitrator decides a consumer's legal rights. *Id.* ¶¶ 3, 7.

As to N.G., Walgreens does not provide the interface N.G. encountered. Walgreens offers

---

[2] For the 2021 flow, Walgreens submits an archive.org capture dated January 26, 2021—a month before R.S.'s account creation and predating the February 18, 2021 effective date of the terms Walgreens says he accepted—showing a checkbox stating "I read and agree to the Walgreens Terms of Use" above a "Continue" button. Parekh Decl. ¶ 13 & n.2, Ex. C; *compare id.* ¶ 14, Ex. D (2021 Terms effective February 18, 2021).

instead N.G.'s account-creation date of December 18, 2018 and its characterization of the 2018 sign-up process. Parekh Decl. ¶¶ 10, 15.[3] N.G. does not recall the specific sign-up screens, any checkbox, or any reference to "Terms of Use," and she does not recall ever clicking on, opening, or reading Walgreens' Terms of Use. Declaration of N.G. ("N.G. Decl.") ¶¶ 5–6. A retired project manager with no legal training, N.G. was an ordinary retail consumer, had never heard of the American Arbitration Association, and has never seen any AAA rules. *Id.* ¶¶ 3, 7. Before this lawsuit, she did not know that Walgreens claimed she had agreed to arbitration, and she never received any notice about arbitration or of any right to opt out. *Id.* ¶¶ 6, 8.

The 2018 and 2021 Terms are materially identical for present purposes. Neither begins with any arbitration notice; the arbitration clause appears in Section VII of a lengthy general document governing all of Walgreens' "online services." Parekh Decl., Exhs. D (2021 Terms) & E (2018 Terms). Section VII requires that "any and all disputes or claims that have arisen or may arise between you and us . . . be resolved exclusively through final and binding arbitration," administered by the AAA under "its rules and procedures, including the AAA's Supplementary Procedures for Consumer-Related Disputes (as applicable), as modified by these Terms" (the non-capitalized word "rules" is itself the hyperlink). *Id.*, Ex. D at 9, Ex. E at 5. Neither version contains any provision addressing who decides arbitrability.

The Terms also direct the arbitrator to "decide the substance of all claims in accordance with the laws of the State of Illinois." *Id.*, Ex. D at 10, Ex. E at 6. The arbitrator may award relief "only in favor of the individual party seeking relief," and "[a]ny relief awarded shall not affect our other users." *Id.* The 2018 and 2021 Terms cap Walgreens' liability at "the purchase price of any items you purchased," disclaim even "direct" damages, require that "any claims . . . be filed within one (1) year," and obligate the user alone to "indemnify, defend and hold harmless Walgreens," including for attorneys' fees, with no reciprocal obligation on Walgreens. *Id.*, Ex. D at 2, 8–10, Ex. E at 2, 5–6.

---

[3] For the 2018 flow N.G. actually encountered, Walgreens submits no screenshot, only Mr. Parekh's assertion that the 2018 process was "substantially similar" to 2021. *Id.* ¶ 15.

## LEGAL STANDARD

The FAA "does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). Its commands "limit[] the courts' role to determining whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 510 (9th Cir. 2023) (quotation omitted). Walgreens, as the party seeking to compel, "has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014); *see also Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). Courts apply "the summary judgment standard of Rule 56," giving the opposing party the benefit of all reasonable inferences. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). If the making of the agreement is genuinely in issue, the FAA requires the Court to "proceed summarily to the trial thereof." *Id.* (*quoting* 9 U.S.C. § 4). Formation is governed by state contract law—here, as Walgreens agrees, California's. Mot. at 7; *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1013–14 n.3 (9th Cir. 2024).

## ARGUMENT

### I. The Court, not an arbitrator, decides whether any agreement was formed.

Walgreens asks the Court to enforce a delegation provision before establishing that any agreement was ever formed. The law does not permit that. "Arbitration is strictly a matter of consent." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (internal quotations omitted). Accordingly, "parties cannot delegate issues of formation to the arbitrator." *Ahlstrom v. DHI Mortgage Co.*, 21 F.4th 631, 635 (9th Cir. 2021). Challenges to "the very existence of the contract" are for the court to decide, delegation clause or no. *Id*. Walgreens nonetheless argues that the Court "lacks authority to[] decide the arbitration agreement's scope because the parties delegated that issue to the arbitrator." Mot. at 11–12 (quoting arbitral rules purporting to delegate "***formation***" to an arbitrator). However, Plaintiffs R.L., I.P., and N.G. dispute that any contract was ever formed. Unless and until Walgreens proves formation, there is no contract and any purported delegation clause is not applicable.

### II. Walgreens has not proven that R.L. or I.P. agreed to arbitrate.

The vaccination scheduling webpage consistently communicated that the checkbox was asking

users to consent to receive appointment-related text messages. Nothing about the webpage objectively communicated that checking the same box also manifested assent to a separate arbitration agreement. The disclosure accompanying the checkbox never departed from its discussion of appointment confirmations, reminder notices, cancellation messages, and other text-message communications. The reference to Walgreens' Terms of Use appeared only as the disclosure's concluding sentence. The page then immediately continued with vaccination conditions and privacy disclosures governing the healthcare transaction. A reasonably prudent user could naturally understand those visible provisions to be the terms referenced immediately above. That user would recognize the checkbox to authorize appointment-related text messages, not to enter a separate agreement governing future legal disputes. Walgreens also cannot establish that R.L. or I.P. ever encountered the archived webpage on which its motion depends, viewed the required checkbox, or checked it. The record therefore establishes neither reasonably conspicuous notice of an arbitration agreement nor the objective manifestation of assent necessary to compel arbitration.

### A. Walgreens did not provide reasonably conspicuous notice of the terms containing the arbitration clause.

Walgreens cannot establish an agreement to arbitrate with R.L. or I.P. An internet consumer is bound to online terms only if the website provided "reasonably conspicuous notice of the terms to which the consumer will be bound" and the consumer took some action that "unambiguously manifest[ed] his or her assent to those terms." *Berman*, 30 F.4th at 856. Those inquiries turn on the overall user experience. They consider the webpage's design, the context of the transaction, and what the webpage objectively communicates the user's action will accomplish. *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1155–60 (9th Cir. 2025); *Godun v. JustAnswer LLC*, 135 F.4th 699, 709–13 (9th Cir. 2025). Walgreens' vaccination scheduling webpage fails under each of those considerations because it consistently communicated that the required checkbox requested consent to receive appointment-related text messages, not assent to a separate arbitration agreement.

The disclosure accompanying the required checkbox establishes that understanding. The sentence on which Walgreens' motion depends, "I also agree to the Walgreens Terms of Use and Privacy Policy," appears only as the final sentence of a nine-line disclosure devoted to a different

subject entirely—consenting to the receipt of scheduling-related SMS text messages. The disclosure begins by telling the user exactly what the checkbox is for. "By checking this box, I agree to receive automated text messages." It then discusses appointment confirmations, cancellations, reminders, data rates, and instructions to "Reply STOP to opt-out." Parekh Decl., Ex. A at 3. Nothing distinguishes the final sentence from the eight lines preceding it. It is not bolded, set apart by a heading, placed in a separate paragraph, or otherwise presented as the operative contractual language. A reasonably prudent internet user who reads the opening of the disclosure has already been told what the checkbox accomplishes, and nothing thereafter communicates that its legal significance has changed.

If the reference to the Terms is noticed at all, the surrounding context naturally suggests those Terms relate to the text-message program the disclosure has been describing, not to a mandatory arbitration provision governing every dispute the patient might later have with Walgreens. Notice that is visually or contextually overshadowed by more prominent, differently-purposed content is not conspicuous. *Godun*, 135 F.4th at 711 (small text placed away from the action button "creates the impression of being visually 'buried'"); *cf. Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 477–82 (2021) (notices sitting outside the payment box "where the consumer's attention would necessarily be focused" were inconspicuous). The context Walgreens' webpage framed for the user was a vaccination appointment and the communications accompanying it, not the formation of a contractual relationship.

The disclosure also misdescribes the legal significance of the checkbox. It expressly tells the user that "my consent is ***not a condition*** for purchasing the services." Parekh Decl., Ex. A at 3 (emphasis added). Walgreens now contends that checking the very same box was the mandatory act that formed a binding agreement to arbitrate because patients could not proceed without it. Parekh Decl. ¶ 7.[4] The webpage therefore communicated that the checkbox was optional consent to receive text messages, not the mandatory act manifesting assent to contractual terms. A design that misdescribes the legal significance of the user's required act is the opposite of an interface that

---

[4] The Parekh Declaration does not support its assertion. Mr. Parekh's stated personal knowledge concerns the walgreens.com *account-creation platform*, not the vaccine-scheduling flow, and no business record supports his description of how the scheduler functioned. Plaintiffs rely on Walgreens' characterization *arguendo* and object to the declaration. *Infra* § II.D.

"explicitly advis[es] that the act of clicking will constitute assent to the terms" on which enforceability depends. *Oberstein*, 60 F.4th at 515 (quoting *Berman*, 30 F.4th at 857). The Ninth Circuit confronted a similar contradiction in *Chabolla*. Because ClassPass's website "advertise[d] '[n]o commitments,'" the court found it "ironic that ClassPass now argues *Chabolla* unambiguously manifested her commitment to an arbitration clause." 129 F.4th at 1159–60. The contradiction is even more direct here.

The remainder of the webpage reinforces the same understanding. Directly beneath the checkbox and "Next" button, the page displays conditions governing the vaccination service together with a numbered footnote concerning the patient's protected health information. Parekh Decl., Ex. A at 3. The footnote is anchored to the email field the user just completed. It governs how Walgreens may contact the patient, addresses the patient's protected health information, warns of interception and disclosure risks, and contains its own agreement mechanism stating that "[b]y entering the patient's email and selecting 'Next', the patient agrees to accept the risks . . . ." *Id*. A reasonable consumer scheduling a vaccination who reads "I also agree to the Walgreens Terms of Use and Privacy Policy," at the end of a checkbox disclosure tied to consent to receive text messages, and then looks immediately below that phrase finds exactly what those words appear to describe, namely use terms governing the vaccination service and privacy disclosures concerning the patient's health information. Nothing on the webpage identifies those disclosures as something different or indicates that the referenced Terms are instead contained in a fifteen-page document behind a hyperlink that includes an arbitration provision governing "any dispute" with Walgreens. The Ninth Circuit's hyperlink cases rest on the premise that the user understands the binding terms reside behind that link. Where the webpage itself displays unlabeled terms fitting the notice's description, that premise disappears, and the notice is at best ambiguous about which terms the user is accepting. *Berman*, 30 F.4th at 856–57; *Chabolla*, 129 F.4th at 1158–60.

The webpage's overall design points in the same direction. A notice must be "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it," *Berman*, 30 F.4th at 856, and the webpage must do something to "capture the user's attention" and direct it to the operative language. *Godun*, 135 F.4th at 713–14 (quoting *Berman*, 30

F.4th at 857). Nothing in Walgreens' vaccination scheduling page does that. The checkbox disclosure appears in small, unbolded text beneath prominent headings, form fields, and action items directing the user to complete the vaccination appointment. The reference to Walgreens' Terms appears only as the final sentence of the checkbox disclosure requesting consent to receive text messages, visually indistinguishable from the SMS discussion surrounding it. Small print, placement outside the user's natural focus, and competing visual elements are the very combination that creates "the impression of being visually 'buried.'" *Godun*, 135 F.4th at 711 (quoting *Berman*, 30 F.4th at 856–57).

The context of the transaction confirms what the webpage objectively communicated. California law asks what relationship the consumer reasonably understood herself to be entering. "When a user simply purchases goods or avails herself of a one-time discount offer, there is less reason for her to expect a continued relationship beyond the purchase." *Chabolla*, 129 F.4th at 1155. Booking a vaccination appointment is the paradigm of a one-time healthcare transaction: no required username, password, account or membership. The patient schedules, receives the shot, and the transaction ends. "In this case involving one-off transactions, reasonably prudent users of defendants' sites are unlikely to be on the lookout for fine print." *Berman*, 30 F.4th at 869 (Baker, J., concurring), quoted in *Chabolla*, 129 F.4th at 1155. A patient scheduling a vaccination has even less reason than a retail shopper to expect that consenting to receive appointment-related text messages also determines the forum for every future dispute with Walgreens.

**B. Checking the box did not unambiguously manifest assent.**

Even if Walgreens had provided reasonably conspicuous notice of its Terms of Use, it still had to show that checking the required checkbox objectively manifested assent to those terms. It cannot. The webpage presented the checkbox as consent to receive appointment-related text messages. Nothing on the webpage objectively communicated that checking the same box also manifested assent to a separate agreement containing an arbitration provision.

Checking a box binds a user only where the user "is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement," *Berman*, 30 F.4th at 857. And the notice "must identify what, exactly, those actions are," *Godun*, 135 F.4th at 711 (citing *Berman*, 30 F.4th at 858). Walgreens' vaccination scheduling webpage does not identify what action manifests

assent to contractual terms. Instead, it tells the user that checking the box authorizes appointment-related text messages. As the webpage disclosure accompanying the checkbox explicitly states, "[b]y checking this box, I agree to receive automated text messages . . . ." Parekh Decl., Ex. A at 3. The reference to Walgreens' Terms of Use appears only later in the disclosure and is not accompanied by any comparable statement explaining that checking the box also manifests contractual assent. Three intervening sentences, including the stand-alone instruction "Reply STOP to opt-out," separate it from the "[b]y checking this box" clause, so that by the time the disclosure reaches the reference to Walgreens' Terms of Use, the webpage has already defined what checking the box accomplishes—consent to receive SMS text messages.

The Ninth Circuit's two most recent published decisions confirm the point. In *Chabolla*, the notice "I agree to the Terms of Use and Privacy Policy" paired with an action button serving a different purpose, "Redeem now," "fail[ed] to tell the user the significance of clicking" and therefore could not establish unambiguous assent. 129 F.4th at 1158–59. *Godun* then "clear[ed] up any remaining confusion" by holding that a notice which "simply states that 'I understand and agree to the Terms and Conditions' but fails to 'indicate to the user what action would constitute assent' is not enough to invite an unambiguous manifestation of assent." 135 F.4th at 713 (quoting *Berman*, 30 F.4th at 858). Walgreens' webpage goes further. It affirmatively assigns a different legal significance to checking the box—authorizing appointment-related text messages—while Walgreens seeks to treat that same act as assent to a fifteen-page agreement containing a mandatory arbitration provision. At best, the act is ambiguous between consenting to receive appointment-related text messages and accepting Walgreens' hyperlinked contract. An ambiguous act does not establish contract formation. *Chabolla*, 129 F.4th at 1158–59; *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178–79 (9th Cir. 2014) (even "close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient").

California law confirms that when a webpage defines a user's act as serving one purpose, that same act cannot simultaneously manifest assent to a broader agreement the interface never identifies. *Herzog v. Superior Court* illustrates the point. 101 Cal. App. 5th 1280 (2024). There, the screen placed checkboxes immediately beside the words "I agree to Terms of Use"—a design far more explicit than

Walgreens'—yet the Court of Appeal held that no arbitration agreement was formed. *Id*. at 1298. The introductory text told users that "ticking the box[es]" signified consent to the collection of their health data. *Id*. By "expressly defin[ing] what it meant to 'agree to Terms of Use,'" the screen "limited the scope of the agreement the user was entering by clicking the checkbox." *Id*. The court explained that the interface "assigned two possible meanings to the act of clicking the checkbox—one narrow and explicit, the other broad and implicit," and thereby "undid whatever notice it might have provided of the contractual terms." *Id*. at 1286, 1304. Because the same act could not establish that the parties agreed "upon the same thing in the same sense," no contract was formed. *Id*. at 1293 (quoting Cal. Civ. Code § 1580); *see also Godun*, 135 F.4th at 713 (citing *Herzog*, 101 Cal. App. 5th at 1297–1305). Though defendant in *Herzog* relied heavily on its categorizing the notice as "clickwrap," the court made clear that "[i]t is the degree of notice provided, not the label, that is determinative." *Herzog*, 101 Cal. App. 5th at 1296 (cleaned up). Even if a single checkbox may be capable of accomplishing more than one legal act, *Herzog* establishes that the interface must objectively communicate each of them. Walgreens' webpage did not.

In *Herzog*, the defendant at least placed "I agree to Terms of Use" beside the checkbox. Walgreens instead opened the disclosure by defining the checkbox as consent to receive appointment-related text messages and mentioned the Terms only in a trailing sentence that never identified what action would manifest assent to them. The design likewise gave patients no way to accept one purported agreement without simultaneously accepting the other. One required checkbox purported to accomplish both, even as the disclosure promised that "consent is not a condition" of service. A single act assigned multiple legal consequences, without any means to distinguish among them, is the opposite of unambiguous assent.

The webpage itself introduces still another source of ambiguity. As discussed above, the checkbox's final sentence references Walgreens' "Terms of Use and Privacy Policy." Immediately below, however, the webpage displays unlabeled conditions governing the vaccination service together with privacy disclosures concerning the patient's protected health information. *Supra* § II.A. A reasonable user who checks the box and continues reading could naturally understand those visible disclosures to be the "Terms of Use and Privacy Policy" referenced immediately above. That layers

yet another plausible meaning onto the same required act. *See Chabolla*, 129 F.4th at 1159 ("[T]hree faulty notices do not equal a proper one."). Walgreens also has no evidence that either Plaintiff performed even that ambiguous act. *Infra* § II.D. An act reasonably susceptible to multiple meanings cannot unambiguously manifest assent to any one of them.

**C. The decisions Walgreens relies on expressly communicated every contractual consequence attached to the user's act.**

Walgreens' authorities reflect the same principle enforced in *Chabolla* and *Godun*. In each case, the interface expressly communicated the contractual significance of the user's action. The notice language in *Oberstein* explicitly advised that, "[b]y continuing past this page, you agree to the Terms of Use." 60 F.4th at 515–17. The interfaces in *Dickey* presented the same single-purpose design. *Dickey v. Ticketmaster LLC*, 2019 WL 9096443, at *6 (C.D. Cal. Mar. 12, 2019) ("[b]y submitting, you agree to our Terms" directly above the "Sign Up" button); *see also Graf v. Match.com, LLC*, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (users clicked a "Continue" button on a registration page that "explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use") (citing to Richards Decl. ¶¶ 3–4 & Ex. 1). Similarly, *Patrick v. Running Warehouse, LLC* enforced a checkout advisal reading "[b]y submitting your order you . . . agree to our privacy policy and terms of use," immediately adjacent to the "Place Order" button. 93 F.4th 468, 474, 476–77 (9th Cir. 2024). None of these cases involved a single act of consent purportedly manifesting assent to two distinct legal acts. *Hooper v. Jerry Insurance Agency, LLC* likewise involved a different design. The action clause itself advised users that clicking "Continue" constituted agreement to the Terms of Use together with the text-message consent. 675 F. Supp. 3d 1027, 1037 (N.D. Cal. 2023). (*Hooper* was also decided before *Herzog*.) Walgreens' action clause reaches only the text messages.

*Berman* explained how an interface objectively communicates contractual assent: "By clicking the Continue >> button, you agree to the Terms & Conditions." 30 F.4th at 858. Walgreens instead, without any explanation, placed a reference to its Terms of Use at the end of an optional text-message disclosure on a crowded vaccination scheduling page. The interface therefore never objectively communicated that checking the required checkbox also manifested assent to contractual terms.

**D. Walgreens has not established that R.L. or I.P. formed an arbitration agreement, and the making of any agreement is therefore an issue of fact.**

Even if Walgreens' scheduling screen were capable of forming an arbitration agreement, Walgreens has not shown that R.L. or I.P. ever formed one. Its motion depends on a May 2026 printout of an archive.org capture of the scheduling page as it allegedly appeared in a desktop browser on a single day, September 1, 2024. But Walgreens submits no record that either Plaintiff visited that page on any date or device, checked the required checkbox, or completed a transaction through that interface. Nothing in Walgreens' evidentiary showing connects that archived webpage to either Plaintiff. Mr. Parekh claims familiarity only with Walgreens' separate account-creation platform, not its vaccination scheduling flow, Parekh Decl. ¶¶ 3–4, and Exhibit A is offered without testimony from anyone with personal knowledge of the Internet Archive's processes. Plaintiffs therefore object to Parekh Decl. ¶¶ 7–8 and Exhibit A. Civ. L.R. 7-3(a); Fed. R. Evid. 602 (a witness "may testify to a matter only if . . . the witness has personal knowledge of the matter"); Fed. R. Evid. 901(a).

The authorities Walgreens invokes require far more. "Unless the website operator can show that a consumer has actual knowledge of the agreement," enforceability turns on the specific screens presented to the consumer and the actions the consumer actually took. *Berman*, 30 F.4th at 856; *Knutson*, 771 F.3d at 565–66. *White v. PayPal Holdings Inc.* denied a motion to compel where the defendant's Wayback captures did not establish the sign-up paths encountered by seven plaintiffs. 821 F. Supp. 3d 1058, 1066–69 (N.D. Cal. 2026). *Scribner v. Trans Union LLC* likewise required a declarant to establish that his responsibilities acquainted him with the specific screens at issue. 738 F. Supp. 3d 1301, 1305–06 (E.D. Cal. 2024). Walgreens has made neither showing here. At a minimum, therefore, the making of any agreement is "in issue." Plaintiffs are entitled to targeted formation discovery, and to a trial, before either may be compelled to arbitration. 9 U.S.C. § 4; *Hansen*, 1 F.4th at 670.

**E. The 2024 Terms' delegation clause and arbitration scheme are unconscionable.**

If the Court concludes that R.L. or I.P. formed a contract, the 2024 Terms still cannot compel arbitration because the delegation provision and the arbitration scheme it guards are unconscionable. Plaintiffs direct this challenge specifically at the delegation provision, as *Rent-A-Center v. Jackson*

requires. 561 U.S. 63, 72–74 (2010); *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009–11 (9th Cir. 2023). *Heckman v. Live Nation Entertainment, Inc.* supplies the governing framework. There, the Ninth Circuit held that a delegation clause and mass-arbitration protocol were unconscionable and affirmed the district court's refusal to sever them from the remainder of the arbitration agreement. 120 F.4th 670, 683–89 (9th Cir. 2024). California weighs procedural and substantive unconscionability on a sliding scale. *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 125–26 (2019) (citing *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 114 (2000)). Both prongs are satisfied here.

The 2024 Terms were imposed on consumers as the non-negotiable condition of scheduling a vaccination. That is the hallmark of oppression. *See, e.g., OTO*, 8 Cal. 5th at 126–28 (holding that oppression and surprise established procedural unconscionability and thus support finding that agreement was unenforceable). The degree of surprise here is equally substantial. The Terms were never displayed to the user. They remained behind a hyperlink appended to a text-message checkbox on a medical intake form (*supra* § II.A), while the delegation provision Walgreens invokes is the incorporation of NAM's rules in the middle of a fifteen-page document.[5] The "Coordinated Filings" regime it protects is no more accessible. Its bellwether process, claim freezes, mandatory global mediation, and Illinois-courts funnel create a procedural labyrinth that no lay reader could reasonably be expected to understand. *Heckman* found a delegation clause "procedurally unconscionable to an extreme degree" on comparable facts: adhesion plus terms and rules so opaque that even the drafter's counsel struggled to explain them. 120 F.4th at 683–87.

The Terms are equally substantively unconscionable. Their "Coordinated Filings" regime replicates the architecture *Heckman* condemned. Most claimants may not file anywhere—not in arbitration, not in court, and with no timetable—while party-selected bellwethers and mandatory global mediation run their course. Parekh Decl., Ex. B at 5–7. Only after that process concludes are any remaining claims funneled to Illinois, subject to the class waiver, the continuing one-year limitations period, and judicial injunctions against non-conforming filings. *Id.* The arbitrator is

---

[5] The delegation-by-incorporation theory fails as to ordinary consumers for the reasons shown *infra* § III.B, and R.L. and I.P. supply the same record as to their sophistication as N.G. and R.S. do. *See* R.L. Decl. ¶¶ 3, 7–10; I.P. Decl. ¶¶ 3, 6–9.

likewise not bound by rulings involving other Walgreens users, entrenching the repeat-player and information asymmetry *Heckman* condemned. *Id.* at 7. Like the protocols that were found unconscionable in *Heckman* and *MacClelland*, Walgreens forbids claimants from filing their claims while the coordinated-filings process runs its course. *See Heckman*, 120 F.4th at 686–88; *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1040–44, 1046 (N.D. Cal. 2022) (mass-arbitration protocol unconscionable where customers "will not be able to file a claim in arbitration for years and possibly ever").

The remaining provisions of the 2024 Terms are no less one-sided. The zero-dollar liability cap, the one-year claims bar, the one-way indemnity, and the Illinois choice-of-law clause all carry forward from the 2018/2021 Terms, and each is unconscionable for the reasons shown below. *Infra* § III.C.

These defects are not isolated flaws that severance could cure; they are the design. Multiple unconscionable provisions "indicate a systematic effort to impose arbitration . . . not simply as an alternative to litigation, but as an inferior forum" that advantages the drafter. *Armendariz*, 24 Cal. 4th at 124 & n.13. The severance inquiry is qualitative—whether the defects taint the agreement's central purpose and whether severance would serve "the interests of justice," including its "deterrent effect"—and *Heckman* affirmed the refusal to sever on materially similar facts, where "unconscionability permeates all aspects of the arbitration agreement." *Ramirez v. Charter Communications, Inc.*, 16 Cal. 5th 478, 515–17 (2024); *Heckman*, 120 F.4th at 688–89. The delegation clause and the arbitration scheme it guards fail together.

**III. The 2018 and 2021 Terms invoked against N.G. and R.S. are unenforceable.**

The 2018 and 2021 Terms do not establish a basis to compel N.G. or R.S. to arbitration. As to N.G., Walgreens has not proven what the 2018 account-creation interface actually showed her. As to both Plaintiffs, incorporation of AAA rules does not clearly and unmistakably delegate arbitrability of ordinary consumer transactions on the record before this Court. The arbitration provisions themselves are also permeated by unconscionability and cannot be enforced.

**A. Walgreens has not carried its formation burden as to N.G.**

Walgreens has produced no screenshot, archived capture, or contemporaneous document

showing what N.G. actually encountered when she created her account in December 2018. Instead, it offers only a single sentence asserting that the 2018 account-creation process was "substantially similar" to February 2021. Parekh Decl. ¶ 15. Plaintiffs therefore object to Paragraph 15 as conclusory and lacking foundation. Civ. L.R. 7-3(a); Fed. R. Evid. 602. A conclusory characterization of an interface (which the declarant does not produce) cannot establish reasonably conspicuous notice or unambiguous assent. Formation is determined screen by screen and plaintiff by plaintiff. *Berman*, 30 F.4th at 856; *Godun*, 135 F.4th at 704–07, 711–13; *Namisnak v. Uber Techs., Inc.*, 315 F. Supp. 3d 1124, 1127 (N.D. Cal. 2018), *aff'd*, 971 F.3d 1088 (9th Cir. 2020). *Ghazizadeh* reached the same conclusion where the movant described an earlier interface only as "similar" to a later version without producing the earlier screen: "[w]ithout an image of what the [earlier notice] looks like, the Court is not able [to] conclude whether it provided sufficiently conspicuous notice." *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 934–35 (N.D. Cal. 2024).

**B. Nothing in the 2018/2021 Terms clearly and unmistakably delegates arbitrability.**

Like its 2024 Terms, Walgreens' only delegation theory for its 2018 and 2021 Terms is incorporation of arbitral rules (this time, AAA). Mot. at 11–12. But the presumption is that *courts* decide arbitrability, displaced only by "clear and unmistakable" evidence. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Whether incorporation of the AAA rules delegates arbitrability as against ordinary consumers remains an open question in the Ninth Circuit. Plaintiffs respectfully ask the Court to hold that, absent an express delegation clause, incorporation of arbitral rules does not clearly and unmistakably delegate arbitrability as to unsophisticated consumers who have never seen those rules and had no reason to know they contained a delegation provision.

*Brennan v. Opus Bank* held that incorporation of the AAA rules supplies clear and unmistakable evidence of delegation, but expressly "limit[ed] [its] holding to the facts of the present case, which do involve an arbitration agreement 'between sophisticated parties.'" 796 F.3d 1125, 1130–31 (9th Cir. 2015) (quoting *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1075 (9th Cir. 2013)). The Ninth Circuit has never extended *Brennan* beyond sophisticated parties and has twice expressly reserved whether incorporation of the AAA rules alone clearly and unmistakably delegates arbitrability in an ordinary consumer contract. In *Patrick*, the court reaffirmed that "[o]ur circuit has

not yet decided whether *Brennan*'s holding should extend to arbitration clauses in consumer contracts between a sophisticated entity and an average unsophisticated consumer," and declined to reach the question only because those plaintiffs "offered no evidence concerning their sophistication or lack thereof to the district court." 93 F.4th at 481–82 (citing *Eiess v. USAA Federal Savings Bank*, 404 F. Supp. 3d 1240, 1252 (N.D. Cal. 2019).

Plaintiffs here supply precisely the record *Patrick* found missing. R.S. is a retired special-education teacher with no legal training, transacting as an ordinary retail consumer who had never heard of the AAA, has never seen any arbitral rules, and had no understanding that a hyperlinked reference to such rules could strip a court of the power to decide whether the contract is valid. R.S. Decl. ¶¶ 3, 5–8. N.G. is a retired project manager with no legal training who likewise transacted as an ordinary retail consumer: she had never heard of the AAA, has never seen any AAA rules, has no recollection of any checkbox or any reference to "Terms of Use" from the 2018 sign-up, and did not know, before this lawsuit, that Walgreens claimed she had agreed to arbitration. N.G. Decl. ¶¶ 3, 5–8. Neither remotely resembles the sophisticated parties to which *Brennan* expressly limited its holding. 796 F.3d at 1130–31. And it is Walgreens that must supply clear and unmistakable evidence of delegation; the presumption that courts decide arbitrability yields to nothing less. *First Options*, 514 U.S. at 944.

On that record, the weight of authority in this District holds that a hyperlink to an arbitral body's rules, buried in an adhesive online agreement, is not clear-and-unmistakable evidence that an ordinary consumer agreed to hand arbitrability itself to the arbitrator. As *MacClelland* summarized in 2022, "every district court decision in our circuit to address the question since *Brennan* has held that incorporation of the AAA rules was insufficient to establish delegability in consumer contracts involving at least one unsophisticated party." 609 F. Supp. 3d at 1031–32 (quoting *Ingalls v. Spotify USA, Inc.*, 2016 WL 6679561, at *3–4 (N.D. Cal. Nov. 14, 2016)) (collecting cases). More recent decisions have reached a different conclusion, declining to condition delegation on consumer sophistication. *See, e.g.*, *In re BAM Trading Servs. Inc. Sec. Lit.*, 733 F. Supp. 3d 854, 863 (N.D. Cal. 2024); *Wray v. Humble Bundle, Inc.*, 824 F. Supp. 3d 868, 876 (N.D. Cal. 2025). But neither decision addresses the question *Patrick* left open. Both rejected the sophistication inquiry as impractical in the

abstract. Neither considered a record like this one, where both consumers affirmatively establish their lack of sophistication. *Eiess* explains why *Patrick* reserved the issue. To discover she had delegated arbitrability, an unsophisticated consumer would have to locate the arbitral rules, find the delegation provision, read it, and understand its "rather arcane" significance. 404 F. Supp. 3d at 1253. Judge Tigar alone so held three times, spanning a decade: *Meadows v. Dickey's Barbecue Rests., Inc.*, 144 F. Supp. 3d 1069, 1077–79 (N.D. Cal. 2015); *Hooper*, 675 F. Supp. 3d at 1039–40; *Kaplan v. Athletic Media Co.*, 705 F. Supp. 3d 992, 1003–04 (N.D. Cal. 2023), *see also Magill v. Wells Fargo Bank, N.A.,* 2021 WL 6199649, at *5 (N.D. Cal. June 25, 2021) (Judge Gonzalez Rogers holding that incorporation of the AAA rules "does not clearly and unmistakably establish an agreement to delegate questions or arbitrability, because customers of Wells Fargo, including Magill, could not be expected to understand" the significance).

Plaintiffs are aware that this Court, in *Cordas v. Uber Technologies, Inc.*, 228 F. Supp. 3d 985, 991–92 (N.D. Cal. 2017), applied *Brennan*'s reasoning to a consumer agreement incorporating AAA rules. Three things have changed. First, *Cordas* rested on the then-prevailing view that "nearly every . . . decision in the Northern District" found delegation "regardless of the sophistication of the parties." *Id.* at 992. The intervening decisions—*Eiess*, *Magill*, *MacClelland*—rejected that view for unsophisticated consumers, and *Patrick* has since confirmed the question remains open and turns on the record. Indeed, *Hooper* was urged to follow *Cordas* and declined. 675 F. Supp. 3d at 1039–40. Second, the *Cordas* plaintiff offered no sophistication evidence; R.S. does, and Walgreens offers nothing to bring N.G. within *Brennan*'s sophisticated-party rule. Third, *Cordas* itself identified the very path Plaintiffs follow here. The plaintiff there never "specifically . . . challenge[d] the delegation clause as unconscionable, thereby raising a question for the Court rather than the arbitrator." *Cordas*, 228 F. Supp. 3d at 992 n.4. Plaintiffs make precisely that challenge below. *See Bielski*, 87 F.4th at 1009–11.

Walgreens' remaining authorities do not answer the issue the Ninth Circuit has expressly reserved. *Sandler v. Modernizing Medicine, Inc.* enforced JAMS-rules delegation in an *employment contract* (the same context as *Brennan* itself) and did not address, much less resolve, the consumer-sophistication question *Patrick* left open. 170 F.4th 1209 (9th Cir. 2026). *Kahl v. Plentyoffish Media*

*ULC* was a forfeiture ruling: the plaintiffs never "challenged the delegation provision[s] specifically," so *Rent-A-Center* required enforcement. 2023 U.S. Dist. LEXIS 103055 (N.D. Cal. June 13, 2023) (Dkt. 19 at 2–3). *Rodriguez v. American Technologies, Inc.* predates *Brennan* and involved a signed, physical contract, not terms behind a hyperlink a retail consumer never followed. 136 Cal. App. 4th 1110 (2006). The incorporation language here is opaque even by the standards of rules-incorporation cases. It layers three qualifications behind a bare "rules" hyperlink, while the governing rules themselves have changed over time. *See* Mot. at 12 nn.2–3 (conceding the rules have since changed). Whatever a straightforward incorporation clause may communicate to a sophisticated party, this one communicated nothing "clear and unmistakable" to an ordinary retail pharmacy consumer. *Aanderud v. Superior Court*, 13 Cal. App. 5th 880, 892 (2017) (the "clear and unmistakable" standard "reverses the typical presumption in favor of the arbitration of disputes"). *Accord Villalobos v. Maersk, Inc.*, 114 Cal. App. 5th 1170, 1187–88, 1192 (2025) (no clear and unmistakable delegation absent an express clause).

If the Court nonetheless finds a delegation, Plaintiffs specifically challenge that delegation as unconscionable—a challenge that belongs to the Court and must be resolved before anything is sent to an arbitrator. *Rent-A-Center*, 561 U.S. at 71–72; *Bielski*, 87 F.4th at 1010–11 (a party may press the same arguments against both the delegation and the agreement, "so long as the party articulates why the argument invalidates each specific provision"); *accord Cordas*, 228 F. Supp. 3d at 992 n.4. The analysis mirrors ordinary unconscionability, trained on the delegation itself. *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 242–50 (2014); *Pinela v. Neiman Marcus Group, Inc.*, 238 Cal. App. 4th 227, 244–47 (2015). Procedurally, any delegation is adhesive and doubly hidden. It appears nowhere in the Terms themselves and arises, if at all, only through a hyperlinked reference to external "rules . . . (as applicable), as modified by these Terms," which themselves changed over time. Oppression and surprise therefore reach their apex. The consumer could neither locate the delegation nor reasonably understand it. *See Pinela*, 238 Cal. App. 4th at 244 ("Although the delegation clause was not hidden from [the plaintiff], it might as well have been."). Substantively, the delegation would operate under the Terms' Illinois choice-of-law clause, so whether Plaintiffs' California rights survive would be decided under the very law selected to extinguish them—the precise pairing *Pinela* condemned as

tainting the delegation itself. *Id.* at 247–51.

The Terms also burden the gateway dispute itself. The one-year limitations period reaches "any claims," shortening the time to challenge arbitrability. The one-way indemnity provision exposes only the consumer to Walgreens' attorneys' fees for bringing that challenge. A delegation operating under those conditions is substantively one-sided. *Infra* § III.C; *cf. Heckman*, 120 F.4th at 686–88. The delegation is unenforceable. Arbitrability therefore stays with this Court, and the Court must reach the question the delegation would have buried: whether the agreement to arbitrate is unconscionable. It is.

**C. The arbitration agreement is permeated by unconscionability.**

**1. Procedural unconscionability.**

Walgreens required consumers to accept the 2018 and 2021 Terms as written or forgo a walgreens.com account. The Terms are therefore adhesive, and adhesion supplies the oppression component of procedural unconscionability. Surprise is equally pronounced. The 2018 and 2021 Terms begin with no arbitration notice of any kind. The arbitration clause appears only in Section VII of a general web-services agreement, which the consumer could reach only by opening a hyperlink the consumer was never required to follow. *OTO*, 8 Cal. 5th at 126–28; *Armendariz*, 24 Cal. 4th at 113–15; *Ting v. AT&T*, 319 F.3d 1126, 1148–49 (9th Cir. 2003), *abrogated in part on other grounds by AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011). Walgreens' May 2024 redesign underscores the point. The first screen now begins with a full-caps "IMPORTANT ARBITRATION NOTICE," a tacit acknowledgment that the earlier versions provided no comparable notice. Parekh Decl., Ex. B at 2.

The buried 30-day mail-in opt-out does not alter the analysis. It appears only within the same hyperlinked Terms the consumer was never required to open. The California Supreme Court has held that even an opt-out presented on a signed, "easily readable, one-page form" did not render an adhesive arbitration agreement "free of procedural unconscionability." *Gentry v. Superior Court*, 42 Cal. 4th 443, 468, 470–72 (2007). *Trout* and *Ahmed* reached the opposite conclusion because the opt-outs there were disclosed, "highlighted, not hidden," and presented directly to the consumer. *See Trout v. Comcast Cable Communications, LLC*, 2018 WL 4638705, at *1–2, *5 (N.D. Cal. Mar. 15, 2018) (Seeborg, J.); *see also Circuit City Stores v. Ahmed*, 283 F.3d 1198, 1200 (9th Cir. 2002). The opt-out

cures nothing. Notice of the right to opt out appears only within the arbitration provision, behind the same unread hyperlink; a consumer who never had reasonable notice of the clause necessarily never had a meaningful opportunity to reject it.

**2. Substantive unconscionability.**

**Zero-dollar exculpation.** For Plaintiffs' claims, the liability cap reduces Walgreens' maximum liability to zero. Liability is capped at "the purchase price of any items you purchased . . . if any," while all "direct, indirect, special, incidental, consequential, or punitive damages" are disclaimed. Parekh Decl., Ex. D at 8, Ex. E at 5. Applied here, the clause eliminates CIPA's $5,000 statutory remedy, Cal. Penal Code § 637.2, and the CMIA's $1,000 nominal damages, Cal. Civ. Code § 56.36(b). Contracts exculpating a party from statutory liability for its own wrongdoing are void, Cal. Civ. Code § 1668, and such remedy-stripping is substantively unconscionable. *MacClelland*, 609 F. Supp. 3d at 1036–37 (limitation-of-liability clause barring statutory damages substantively unconscionable; "an arbitration agreement may not limit statutorily imposed remedies" (quoting *Armendariz*, 24 Cal. 4th at 103)).

**One-year claims bar.** The Terms require that "[a]ny claims" be filed within one year, shortening the limitations period for each of Plaintiffs' claims carrying a statutory period of two years or more. *See* 18 U.S.C. § 2520(e); Cal. Penal Code § 502(e)(5); Cal. Civ. Proc. Code §§ 335.1, 338(a). The shortened period is particularly one-sided here because Plaintiffs allege Walgreens secretly tracked their communications in a manner that was undiscoverable. Compl. ¶¶ 207–211. *MacClelland*, 609 F. Supp. 3d at 1034–36 ("A contractual clause restricting the period in which an arbitration may be commenced is unconscionable where the period is 'far shorter' than that otherwise available under California law." (quoting *Wherry v. Award, Inc.*, 192 Cal. App. 4th 1242, 1249 (2011))); *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1094–96 (9th Cir. 2024) (one-year filing provision substantively unconscionable where it severely restricted the ability to vindicate statutory rights). Walgreens cannot avoid that conclusion by pointing out that the clause is facially bilateral. In the consumer context, a shortened limitations period "is inherently one-sided against complaining consumers," because consumers, not Walgreens, are the only parties realistically subject to it. *Fisher v. MoneyGram Int'l, Inc.*, 66 Cal. App. 5th 1084, 1105 (2021).

**Illinois choice of law and other one-sided provisions.** For California consumers asserting California statutory privacy claims, the Terms require the arbitrator to "decide the substance of all claims in accordance with the laws of the State of Illinois." Parekh Decl., Ex. D at 10; Ex. E at 6. Applied here, the clause does not merely select governing law. It would extinguish the California statutory rights Plaintiffs seek to enforce and operate as a waiver of protections California makes unwaivable. *See Pinela*, 238 Cal. App. 4th at 248–51; Cal. Civ. Code § 3513; *see Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 464–66 (1992). The Terms also require the consumer alone to indemnify Walgreens for its attorneys' fees, reserve Walgreens alone the right to rewrite the Terms at any time, and confine the arbitrator to relief that "shall not affect our other users." Parekh Decl., Ex. D at 2, 9–10, Ex. E at 2, 5–6; *Armendariz*, 24 Cal. 4th at 117–21 (terms lacking a "modicum of bilaterality" are unconscionable); *Douglas v. U.S. Dist. Court*, 495 F.3d 1062, 1066 (9th Cir. 2007) (per curiam).

**3. Permeation.**

This is not a case involving a single severable provision. The arbitration agreement combines four independently unconscionable provisions with an adhesive presentation that never gave consumers reasonably conspicuous notice of its terms. California law asks whether those defects taint the agreement's central purpose and whether severance would further the interests of justice, including its deterrent effect. *Ramirez*, 16 Cal. 5th at 515–17. These defects reflect "a systematic effort to impose arbitration" not as an alternative to litigation "but rather as an inferior forum." *MacClelland*, 609 F. Supp. 3d at 1045–46. Severance would reward, rather than deter, the very overreaching California law condemns; the Court should refuse to enforce the agreement rather than rewrite it. *See id.*; *Armendariz*, 24 Cal. 4th at 124–27 & n.13; *Ronderos*, 114 F.4th at 1099–1103; *Heckman*, 120 F.4th at 688–89.

**IV. No stay is warranted, and any stay should be limited to compelled claims.**

Because no Plaintiff should be compelled to arbitration, no stay is warranted and this action should proceed. If the Court nonetheless compels arbitration of some claims, *Smith v. Spizzirri* controls what happens to those claims: on a party's request, section 3 of the FAA requires the Court to stay, rather than dismiss, the compelled claims pending arbitration. 601 U.S. 472, 475–78 (2024). *Spizzirri* says nothing, however, about claims the Court does not compel. Whether to stay claims the Court does

not compel, including those of Plaintiffs who never formed any agreement, remains committed to the Court's ordinary discretion over its docket. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983) (whether to stay litigation among non-arbitrating parties "is left to the district court . . . as a matter of its discretion to control its docket"); *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936); *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863–64 (9th Cir. 1979). That discretion favors allowing this action to proceed. All four Plaintiffs challenge the same tracking practices, any claims not compelled to arbitration will remain before this Court, and a blanket stay would delay their resolution without conserving judicial or party resources.

## CONCLUSION

The motion should be denied in full. Plaintiffs' objections to the Parekh Declaration should be sustained. As to R.L. and I.P., Walgreens has not proven that any agreement to arbitrate was formed. The screen it proffers presented a text-message checkbox, not a contract, and its evidence does not establish what either Plaintiff saw or did. Alternatively, as to R.L. and I.P., the Court should order a trial on formation under 9 U.S.C. § 4 or permit targeted formation discovery. Even if the Court concludes that a contract was formed, the arbitration agreement and delegation mechanism in the 2024 Terms are unconscionable and unenforceable. As to both N.G. and R.S., the 2018 and 2021 Terms neither clearly and unmistakably delegate arbitrability nor create an enforceable agreement to arbitrate because the arbitration scheme is permeated by unconscionability. In addition, Walgreens has not met its burden to prove formation as to N.G. where it has not presented what screen she actually encountered when creating an account and its declarant only provides a statement that the screen she would have been presented with is "substantially similar" to an account creation screen over two years later. If the Court orders a stay, it should extend only to claims, if any, that the Court compels to arbitration.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Andrew R. Tate*

Andrew R. Tate (*pro hac vice* granted)
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE LLP**
235 Peachtree St. NE, Suite 400,
Atlanta, GA 30303

Tel: (314) 669-3600
atate@peifferwolf.com

Matthew J. Langley (SBN 342846)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue, Chicago, IL 60614
Tel: (773) 554-9354
matt@almeidalawgroup.com

*Attorneys for Plaintiffs & the Proposed Class*